[Civ. No. 6292.    Fourth Dist.    Oct. 26, 1960.]

FRANCES FELTY ROTH et al., Plaintiffs and Appellants, v. SHELL OIL COMPANY (a Corporation), Defendant and Appellant.

Young, Zetterberg, Henrie & McCarthy and John C. McCarthy for Plaintiffs and Appellants.

Wilson & Wilson for Defendant and Appellant.

GRIFFIN, P. J.—Plaintiffs, respondents and cross-appellants, husband and wife, brought this action against defendant, appellant and cross-respondent corporation for claimed damages for trespasses occurring on July 27 and July 29, 1957. A third cause of action for breach of contract was dismissed by plaintiffs.

Plaintiff, Mrs. Roth, formerly Frances Felty, had, for a number of years, operated a service station, a restaurant and occupied an apartment on her property in Upland, selling Shell products under a dealer sales contract with defendant Shell Oil Company, a corporation (hereinafter referred to as "defendant" or "Shell"), which contract was dated May 16, 1950, and subject to termination on November 21 of each year upon 30 days' prior notice by either party. It was provided therein that during the continuance of the contract the dealer could use Shell's trademarks, trade names and color scheme, and that all signs and other advertising devices furnished by Shell to the dealer would remain the property of Shell and be surrendered to Shell upon demand if the dealer ceased to purchase products under the agreement or if the contract was terminated. A large Shell sign and pole were loaned to plaintiffs under a similar agreement dated January 11, 1955.

Frances Felty married E. W. Roth in 1952 and the two of them continued operation of the service station. Products were supplied to the station by one McCauley, a Shell distributor, who sold Shell products to accounts in his territory. It appears that over the years plaintiff's relationship with Shell had been on good terms. One Boardman, a merchandising representative of Shell, who assisted the district manager in carrying out details of any decisions made by his superiors to terminate a dealer's sale contract, for a period prior to July 27, 1957, observed the Roths' station, concluded that it was no longer in operation because he found it closed on occasions during normal business hours, and saw, on one occasion, a "closed" sign posted on it. During the week of July 22, he recommended to his superior that the account be closed out, the contract terminated and Shell's identifying

signs removed. Upon this recommendation, and without checking with the Shell district office as to accounts of sale of petroleum products over this period to plaintiff, and without making any further inquiry or giving any written notice of termination of the contract, Boardman ordered an independent contractor to remove the Shell sign and pole and paint out the Shell colors upon the gasoline pumps and building, and discontinued service to the station. It appears that about July 27 the pumps, part of the building, and a sign owned by plaintiffs posted thereon, which were formerly yellow, were repainted a gray color. Mrs. Roth, while in her café, noticed the workmen and assumed they were just repainting her pumps yellow. Soon thereafter the workmen left. On July 29 they entered again upon the premises and the sign and pole were removed. At that time plaintiffs were present, protested and called the police. Thereafter Shell discovered there had been no termination of the contract and no actual cessation of service, and on August 2 succeeded in reaching Mrs. Roth on the telephone and informed her of the mistake they had made in their office and offered to restore the premises to their former condition. Mrs. Roth admits this conversation but refused the offer and employed an attorney to bring this action. Shell was notified that plaintiffs were considering the contract terminated 30 days after the date of the letter and ordered Shell to remove all gasoline from the service station within 24 hours, which recently had been delivered. Mrs. Roth testified that no effort was made to reopen the station because she would have been required, by city building code provisions, to make improvements which she could not afford and she feared Shell would cancel the agreement as of November 21, 1957, the date that it would be subject to termination by either party.

Mr. Roth testified that the net profits from the operation of the service station were $102 per month and that he lost four months' profit up to November 21, 1957. Defendant produced records showing average sales of 1,170 gallons of gasoline per month just prior to July 27 and accordingly stated plaintiffs' profit was about 5 cents per gallon, indicating a prior gross monthly income of $65 per month. Mr. Roth further testified that the value of the two pumps was $400 before they were painted, and that they had a value of one-third or $133.33 less after being painted the grayish color. Defendant claimed they could be repainted for $7.00 apiece. Mrs. Roth testified her restaurant closed on Mondays and they often closed the gas station on that day because they remained open on Sun-

days; that they often did not open the station until 10 a.m., but stayed open until midnight (averaging about 13 hours per day) to catch the trade after other stations had closed; that she was in her café or apartment on the property most of the time and would have been available to defendant if any inquiry had been made. She testified further that any money obtained from the service station belonged to her husband because he ran that part of the business; that the removal of the big illuminated Shell sign blacked out, to a great extent, the restaurant and it adversely affected her café business. Upon this evidence, the jury rendered a verdict in favor of plaintiffs for $540 compensatory damages and $10,000 punitive damages. On a motion for a new trial by defendant, the court ordered a new trial on the grounds of insufficiency of the evidence and excessiveness of the verdict unless plaintiffs filed a written consent to a reduction of $8,000 as to the punitive damages awarded. Plaintiffs filed such consent and a new trial was accordingly denied. Subsequently, plaintiffs filed a cross-appeal from the judgment and from the conditional order. [■■ It would appear that under the case of *Conlin* v. *Southern Pacific R.R. Co.*, 40 Cal.App. 743, 747 [182 P. 71], where a motion for a new trial is granted, to go into effect unless plaintiff stipulates to reduce the verdict, in which event the motion is denied, plaintiff, by giving the stipulation and entering judgment thereon, waives any right to appeal. Filing the remittitur amounted to an acceptance and consent to such judgment. (See also *Fairfield* v. *American Photocopy Equipment Co.*, 158 Cal.App.2d 53 [322 P.2d 93].)

■■ Defendant appeals from the entire judgment. The first question on this appeal involves the sufficiency of the evidence to support the verdict as to compensatory damages. It might well appear that the sum of $540 allowed by the jury was made up from the claimed loss of profit at $102 per month from July 27 to November 21, when the contract could be otherwise terminated, and a loss of $133.33 in value in repainting the two pumps. Mr. Roth claimed he kept books on the gasoline sales and on other products, but he did not produce them. He stated that the gasoline sales were about 90 per cent of the gross sales. He did not particularly dispute the sales records of defendant company as to prior sales. Objection was made as to his qualifications as an expert qualified to give an opinion as to the value of the pumps before and after they were repainted, because he was not the real owner of them and was not otherwise qualified to answer the question.

The evidence does indicate that Mrs. Roth owned the pumps before her marriage to Mr. Roth, but just what property arrangements were made between her and her husband thereafter is not clear. Mrs. Roth did state that she turned over the gas station to him to operate and he was authorized to keep the proceeds. The court held that there was sufficient evidence of his possessory interest to allow his testimony as to value to stand, even though defendant company's evidence indicates the pumps could have been repainted by it for $7.00 apiece. (*Feder* v. *Bryson*, 111 Cal.App. 448, 453 [395 P. 546] ; *Burt* v. *Philadelphia Shoe Co.*, 118 Cal.App. 50 [4 P.2d 612] ; *Willard* v. *Valley Gas etc. Co.*, 180 Cal. 561 [182 P. 32].) The conflict in the evidence was a question for the determination of the jury and apparently it rejected defendant's evidence in respect to the amount of profits lost and damages suffered.

Defendant also argues that it was the duty of plaintiff, in mitigation of the damages, to have accepted defendant's offer to restore or secure another company and reopen the station. Plaintiffs pointed out that since defendant had the right to and would probably cancel the contract on them on November 21, it would have been useless to recondition the station for that short period and no money would have been saved by doing it. It was further contended that if this contract was terminated it would have been impractical to operate the station because it would have been necessary to make other improvements on the property due to city code requirements. The jury was fully and properly instructed on the subject of mitigation of damages and plaintiffs' duty in respect thereto. If the jury believed this evidence then it was authorized to believe that a different course, if taken, would have resulted in no reduction of damage. (*Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840 [147 P.2d 558].)

The next and principal question arises over the sufficiency of the evidence to support the verdict for $2,000 punitive damages. Defendant argues that there was not sufficient evidence of *oppression*, fraud or malice shown. Section 3294, Civil Code, permits the recovery of punitive damages for breach of an obligation not arising from contract where defendant has been guilty of *oppression*, fraud or malice, express or implied.     The word "oppression" as applied in *Baker* v. *Peck*, 1 Cal.App.2d 231 [36 P.2d 404], was held to mean " 'An act of subjecting to cruel and unjust hardship.' " (Citing 46 C.J. 1121, describing it as " 'An act of . . .

domination.' '') Webster's Dictionary defines it as ''Unjust or cruel exercise of authority or power, esp. by the imposition of burdens.'' (See also *Spencer* v. *San Francisco Brick Co.,* 5 Cal.App. 126 [89 P. 851].) The jury was instructed accordingly. In *Davis* v. *Hearst,* 160 Cal. 143, 146 [116 P. 530], it was said, quoting from the syllabus:

''The only presumption touching malice in fact is that announced in section 1962 of the Code of Civil Procedure, which declares as a conclusive presumption 'the existence of a malicious and guilty intent, from the deliberate commission of an unlawful act, for the purpose of injuring another.' Before this presumption arises, the jury must find as facts: (1) the commission of an unlawful act; (2) that its commission was deliberate, and (3) that it was committed with the deliberate purpose of injuring another.''

*St. Ores* v. *McGlashen,* 74 Cal. 148 [15 P. 452], holds that: ''Under section 3294 of the Civil Code, the awarding of exemplary damages for tortious acts is not confined to cases in which malice on the part of the defendant appears.''

As between oppression and malice, there must be some evidence of one or the other of these elements to justify the jury in making the award. It follows that a tort committed by mistake, in the assertion of a supposed right, or without any wrong intention, and without such recklessness as evinces malice or a conscious disregard of the rights of others, does not warrant punitive damages. (*Lyles* v. *Perrin,* 119 Cal. 264, 266 [51 P. 332].) Accordingly, if we accept the evidence of the defendant, the jury might well have believed that a tort was committed by mistake. The only question is whether or not a jury might rightfully draw an inference from the evidence produced that there was a conscious disregard for the rights of others which constituted an act of subjecting plaintiffs to cruel and unjust hardship. In all classes and kinds of cases in which exemplary damages are sanctioned, there must be made to appear to the satisfaction of the jury the evil motive, the *animus malus,* shown by malice in fact or by its allied malign traits and characteristics evidenced by fraud or ''oppression.'' An award of exemplary damages cannot be based on mere speculation; it depends instead on a definite showing of a willingness to vex, harass, or injure consistent with a wrongful intent to injure. (*Wolfsen* v. *Hathaway,* 32 Cal.2d 632 [198 P.2d 1].) The wrongful personal intention to injure is the factor that calls forth the penalty of exemplary damages. (See also 14 Cal.

Jur.2d 809, § 175; *Acadia, California, Ltd.* v. *Herbert*, 54 Cal.2d 328, 336, 337 [5 Cal.Rptr. 686, 353 P.2d 294].)

Since the jury awarded punitive damages, it impliedly found not only that defendant had committed a tort, but also that it acted with malice or intent to oppress. Notwithstanding the testimony of defendant, the jury might well have believed that defendant intended to oppress these plaintiffs. It did make observations that the gas station was closed on certain occasions. It did not take the trouble to inquire of plaintiffs, who were living on the premises, as to whether this was or was not a fact, but instead ordered its agent to repaint the pumps, paint out the Shell colors on a portion of the building, and removed the Shell light globe on each pump and the neon lettering. It further appears that Shell was interested in attempting a termination of the contract by mutual agreement. McCauley testified that Boardman ''advised that Shell was going to remove their sign and paint out the pumps.'' McCauley, in considering the ''cancelling out'' of plaintiffs' contract, requested written instructions from the Shell Oil Company ''because I must at all times try to keep myself clear of all after-effects.'' This might reasonably indicate that McCauley's apprehensions about ''after-effects'' and his desire to have specific written instructions, supports the jury's verdict that Shell demonstrated a willingness to vex, harass, annoy or injure which would be consistent with a wrongful personal intention to injure plaintiffs' business or property. This is further supported by the evidence that on the second occasion of trespass plaintiffs called the police to protect their property and that defendant's agent well knew of the trespass that was being committed. Under the circumstances, we believe that the jury had the right to award punitive damages. (*Sturges* v. *Charles L. Harney, Inc.*, 165 Cal.App.2d 306 [331 P.2d 1072].)

The remaining argument is that the $2,000 awarded as punitive damages was not commensurate with, or out of proportion to, the compensatory damages awarded. We see no merit to this contention. This subject is fully discussed in *Finney* v. *Lockhart*, 35 Cal.2d 161 [217 P.2d 19].

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied November 22, 1960, and the petition of defendant and appellant for a hearing by the Supreme Court was denied December 21, 1960.