[Civ. No. 14887. Third Dist. Oct. 3, 1977.]

BRIAN E. BROUSSEAU, a Minor, etc., Plaintiff and Appellant, v.
JERALD JARRETT, Defendant and Respondent.

COUNSEL

Wallace J. Smith for Plaintiff and Appellant.

Leonard & Lyde and Robert L. Hewitt for Defendant and Respondent.

OPINION

JANES, J.—Plaintiff minor appeals from a judgment of dismissal entered after the court sustained defendant medical doctor's general and special demurrers to plaintiff's first amended complaint (hereinafter, complaint) without leave to amend. Before the demurrers were sustained, the court offered plaintiff an opportunity to amend the challenged pleading, but plaintiff declined to do so.

The complaint, which is denominated one "for medical malpractice based upon tortious conduct only," is in two counts. Plaintiff seeks the sums of $3,897.11 in special damages and $250,000 in punitive damages, such damages being "in tort only . . . ."

### ALLEGATIONS OF FIRST COUNT

Plaintiff suffered personal injuries on August 6, 1971, when struck by an uninsured hit-and-run motorist operating a motor vehicle in Chico. At the time of the accident, plaintiff was an insured under his father's Allstate insurance policy, which contained an uninsured motorist provision. By the terms of that provision, plaintiff was entitled to compensa-

tion for all damages for which the uninsured motorist would be liable to plaintiff, up to $15,000.

Defendant, a physician and surgeon, was consulted by plaintiff ("by and through his parents") to diagnose, treat, and care for plaintiff's aforesaid injuries, "and to do all the things necessary which are the normal incidents of such care and treatment," including the preparation of reports containing defendant's prognosis as to whether plaintiff would have residual disability resulting from the accident, and also including the furnishing of such reports to authorized persons for medical-legal purposes. Defendant knew that his reports would be relied upon heavily in evaluating plaintiff's claims for damages arising from the accident, whether those claims were resolved by settlement or adjudication.

Plaintiff was last seen by defendant on December 10, 1971. In August and October of that year, Allstate requested defendant to furnish Allstate with reports containing defendant's prognosis concerning plaintiff. In November and December 1971, defendant furnished Allstate with written reports in which defendant stated that he believed plaintiff would have no residual disability from the accident. Defendant knew, or should have known in the exercise of reasonable care, that plaintiff's injuries were of a potentially more serious nature with reference to residual disability than defendant reported to Allstate. Defendant's conduct was "wilful, intentional and negligent. . . ."

On the basis of defendant's two reports, Allstate negotiated with plaintiff's parents concerning possible settlement of plaintiff's claim under the uninsured motorist provision of the policy. Allstate eventually offered $7,500 to settle the claim; and Allstate asserted that $7,500 was a reasonable sum because defendant's reports indicated that plaintiff would have no residual disability.

As a proximate result of defendant's "conduct and negligence," plaintiff ("by and through his father") suffered damages in the form of attorney's fees and litigation costs in the sum of $3,897.11 reasonably incurred in order to secure a more advantageous resolution of plaintiff's claim against Allstate. The claim was settled for the full policy limit of $15,000 under the uninsured motorist provision after plaintiff's counsel convinced Allstate that defendant's reports "were erroneous, unduly conservative, and inconsistent with the sequel and residuals which are ordinarily known to follow injuries of the type sustained by [plaintiff]."

## ALLEGATIONS OF SECOND COUNT

The second count incorporates by reference all the allegations of the first count, and further alleges as follows:

Defendant is frequently employed by Allstate and other insurance companies to make examinations and reports thereof with respect to injured persons *not* under defendant's care. Defendant knows that these reports are used by the insurance companies as the basis for settlement or adjudication of claims against those companies or their insureds. Defendant is aware that the insurance companies which solicit these reports are interested in resolving such claims at the lowest possible settlement figure. Defendant is also aware that a conservatively written medical report which minimizes or fails to accurately evaluate potential residual disability "is oppressive to the injured person and will ordinarily enable the insurance companies to settle or adjudicate their claims on a basis far more favorable to the insurance company, and therefore adverse to the interest of the injured claimant. . . ."

Defendant is further aware that he is asked by insurance companies under these circumstances to conduct such examinations and render reports thereof because he traditionally prepares his reports in an unduly conservative fashion designed to minimize in each case the nature and extent of the residual disability. A substantial portion of defendant's income from his medical practice is derived from doing examinations and reports thereof and being a witness with respect thereto. Defendant and the aforesaid insurance companies have an understanding—"though unwritten and perhaps unexpressed concisely"—that defendant will prepare all such reports in a conservative fashion to enhance the position of the insurance company in its negotiations with the injured claimants.

Defendant engaged in the conduct described in the second count "intentionally, wilfully, fraudulently, and with a wanton, reckless disregard for the possible injuries [*sic*] consequences . . . and as a result of . . . said intentional, wilful, wanton, reckless, oppressive, and fraudulent conduct, plaintiff is entitled to exemplary damages. . . ."

## DEMURRERS

Defendant generally demurred on three grounds, namely, that the complaint (1) does not state facts sufficient to constitute a cause of action "in that no recoverable damages are alleged," (2) does not state facts

sufficient to constitute a cause of action for the recovery of punitive damages, and (3) does not state facts sufficient to constitute a cause of action within the jurisdiction of the superior court. Defendant's special demurrer was on the single ground of a defect or misjoinder of parties. (See, Code Civ. Proc., § 430.10.) The general and special demurrers were to the complaint as a whole rather than to individual counts.

## CONTENTIONS

### Special Demurrer

■ Preliminarily, we uphold plaintiff's contention that the special demurrer should not have been sustained. Defendant argues—as he did in the trial court—that it appears from the complaint that defendant was an agent of Allstate and that Allstate therefore should have been joined as his principal. The argument is devoid of merit. Nothing on the face of the complaint supports defendant's agency theory. The pleading states no facts requiring Allstate's compulsory joinder as an indispensable party (Code Civ. Proc., § 389); and it contains no allegations which indicate that defendant might be prejudiced by nonjoinder of Allstate. Consequently, the court's ruling on the special demurrer was erroneous. (See, *Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 99 [124 P.2d 34, 140 A.L.R. 570]; *Tregear* v. *Etiwanda Water Co.* (1888) 76 Cal. 537, 541 [18 P. 658]; *McKelvey* v. *Rodriquez* (1943) 57 Cal.App.2d 214, 223 [134 P.2d 870]; 37 Cal.Jur.2d, Parties, §§ 62-63, pp. 406-407; 39 Cal.Jur.2d, Pleading, § 142, pp. 205-206.)

### General Demurrer to First Count

■ As indicated above, the first count inconsistently alleges that defendant's conduct was both "intentional and negligent. . . ." Such allegations, although contradictory in form, satisfactorily plead negligence in general terms and are not reached by general demurrer. (*Ward* v. *Jones* (1952) 39 Cal.2d 756, 760 [249 P.2d 246]; see also *Ryan* v. *Jacques* (1894) 103 Cal. 280, 284 [37 P. 186]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading (hereinafter Witkin, Pleading), § 471, p. 2126 and § 802, p. 2415; 39 Cal.Jur.2d, Pleading, § 138, pp. 200-201.) In the trial court, plaintiff proceeded on the theory that the first count sounded in negligence, rather than in intentional tort or breach of contract. He makes the same election on appeal. ■ The rule is, of course, that "a general demurrer should not be sustained if the pleading, liberally

construed, states a cause of action on any theory." (*Covo* v. *Lobue* (1963) 220 Cal.App.2d 218, 221 [33 Cal.Rptr. 828].)

■ Plaintiff correctly contends that the first count states a cause of action for actionable negligence. ■ "Actionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770].) ■ As stated above, the first count alleges that plaintiff, by and through his parents, "consulted" defendant for the specific purpose—among others—of having defendant furnish to authorized persons medical-legal reports containing defendant's prognosis as to whether plaintiff would have residual disability from the accident. When the word "consulted" is liberally construed in a contractual sense, these allegations sufficiently plead a duty on defendant's part to use reasonable care to furnish an objective prognosis, a duty which arose from defendant's employment to perform the specific professional service. (See Witkin, Pleading, § 457, pp. 2112-2113, and § 462, p. 2117.) Defendant's argument that he owed no legal duty to plaintiff to prepare medical-legal reports "in a fashion other than conservative" overlooks the allegation that he was engaged for the express purpose of reporting his prognosis to authorized persons (inferentially including Allstate). (See Witkin, Pleading, § 283, pp. 1956-1957, and § 800, pp. 2413-2414.) The first count adequately alleges defendant's breach of his aforesaid duty of care. (See Witkin, Pleading, §§ 465-470, pp. 2119-2126.)

Defendant further asserts that litigation costs and attorney fees cannot be recovered in the tort action where they are incurred. The first count alleges that defendant's negligence proximately caused plaintiff (by and through his father) to incur litigation costs and attorney's fees in obtaining a favorable settlement with Allstate *prior* to the instant suit. Such prior expenses may be recovered in this action if supported by the evidence. (See, *Moe* v. *Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 303 [98 Cal.Rptr. 547]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 882, pp. 3168-3169.) Contrary to defendant's argument, plaintiff's special damages—as alleged—are not remote, speculative or uncertain as being dependent on the act of a third person, Allstate. The first count alleges that Allstate's $7,500 offer was based upon defendant's negligent reports. Defendant's demurrer provisionally admitted the latter allegation. (Witkin, Pleading, § 800, p. 2413.)

*General Demurrer to Second Count*

■ The general rule is that a demurrer which refers to the complaint as a whole will be sustained only when *all* counts are defective. (Witkin, Pleading, § 804, p. 2416.) ■ However, although the first count states a cause of action, it alleges damages in an amount ($3,897.11) insufficient to invoke the jurisdiction of the superior court. (Cal. Const., art. VI, § 10; Code Civ. Proc., § 89, subd. (a)(1).) The same $3,897.11 in actual damages is sought under the second count; but unlike the first count, the second count also seeks $250,000 in punitive damages—a sum far in excess of the minimum monetary jurisdiction of the superior court. Accordingly, the controlling issue on this appeal is whether the second count states a cause of action for the recovery of punitive damages. (See 1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 19, pp. 545-546, and § 25, pp. 551-552.)

Civil Code section 3294 provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

It is unnecessary for us to determine whether the second count alleges facts showing the noncontractual obligation required by section 3294. We need not reach that issue because the second count's conclusory characterization of defendant's conduct as intentional, willful and fraudulent is a patently insufficient statement of "oppression, fraud, or malice, express or implied," within the meaning of section 3294. (See, *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 27-32 [122 Cal.Rptr. 218]; 1 Witkin, Pleading, § 272, pp. 1944-1946; cf. *Richardson* v. *Employers Liab. Assur. Corp.* (1972) 25 Cal.App.3d 232, 244-246 [102 Cal.Rptr. 547]; *Roth* v. *Shell Oil Co.* (1960) 185 Cal.App.2d 676, 681-682 [8 Cal.Rptr. 514].)

Since the second count does not state a cause of action for the recovery of punitive damages, the $3,897.11 sought under the first and second counts as actual damages is an insufficient sum to confer jurisdiction upon the superior court.

The judgment is reversed and the matter is remanded to the superior court with directions to overrule the demurrer to the first cause of action and to transfer the action to the municipal court. Costs to plaintiff.

Friedman, Acting P. J., concurred.

**PARAS, J., Concurring and Dissenting.**—With the portion of the majority opinion which holds that the second count of the unverified complaint does not state a cause of action for the recovery of punitive damages, I agree and concur. Civil Code section 3294 provides that when the plaintiff is able to show "oppression, fraud, or malice, express or implied," the court may consider whether or not to award punitive damages; as pointed out by the majority, plaintiff's allegations are a "conclusory characterization" and a "patently insufficient statement."

However, I cannot concur in the reversal and remand of the first count, wherein for the first time in California recovery of damages (in the form of financial detriment) for a negligently written medical report is sanctioned. I dissent for two basic reasons. First, sound public policy considerations dictate that such recovery should not be permitted. Second, under traditional tort concepts the first count fails to plead, and could never honestly plead, all the necessary elements of a compensable civil wrong. Moreover, I am critical of the majority because if such recovery is to be allowed, it should be based upon a medical malpractice theory rather than general negligence; the majority does not so restrict it.

I

Not because I quarrel with the accuracy of the majority's statement of the first count's operative facts, but because I wish them to be literarily more harmonious with my ensuing comments, I restate them here.

After plaintiff's injury, his parents took him to the defendant doctor "to diagnose, treat, and care for the injuries sustained by the minor . . . and to do all the things necessary which are the normal incidents of such care and treatment, including but not limited to: . . . preparing and furnishing of medical reports to authorized persons for medical-legal purposes; examination and reporting the findings, treatment, care and prognosis, impairment and disability evaluation in the form of medical reports to be furnished to authorized persons for medical-legal purposes including the determination of the nature and extent of the injuries and the nature and extent of impaired function, present and future disability potential which may have been precipitated by the said hit-and-run accident of August 6, 1971."

The defendant was fully aware that "his records, reports, and expressions of the matters contained therein, including his impressions and opinions relating to the nature and extent of injury, impairment of function, and disability and prognosis, would be relied upon heavily and used as a basis for settlement or adjudication of claims for damages arising out of the injuries sustained by the minor . . . ."

The defendant "knew that future impairment of function, future disability and residual of any kind to the minor, . . . based upon reasonable medical certainty, . . . would be very significant factors in the evaluation of claims [for damages of the plaintiff] whether resolved by settlement or adjudication, . . ."

Treatment of plaintiff continued up to December 10, 1971, the last day defendant saw him. Medical reports were requested by Allstate, which provided uninsured motorist coverage to plaintiff under the provisions of an automobile liability policy issued to his parents. Two were prepared and delivered by defendant, one on November 12, 1971, and the second on December 23, 1971.[1] The first states in its entirety:

"The above captioned patient was struck by a car on 8-6-71, with a resultant fracture of the left femur and the immediate subtrochanteric area. He had multiple contussions [sic] and abrasions. He was placed in Buck's traction and did very well.

"On 9-11-71, he was discharged after the fracture had united securly [sic] enough to allow it to be placed in a one and a half hip spica. After discharge from the hospital the patient was followed in the office and on October 23, the cast was removed.

"X-rays throughout have indicated that the patient has had excellent healing. On that date he was released to begin weight bearing. He will return in approximately six weeks to this office.

"The patient has excellent configuration and good healing at the fracture site. Particular mention was made by one of your agents regarding the possibility of injury to a growth cartilage. His growth cartilage was not injured in that it was not close to the fracture site. It would be very unusual for the growth cartilage to prematurely close with a fracture at this level. At this stage it would be highly unlikely likewise

_____

[1]The medical reports are incorporated into the complaint by reference.

that the patient would show an avascular necrosis of the femoral head. This is still a possibility, however, I believe that it is rather remote. I do not believe the patient will have permanent residua and I believe that shortly he will be ambulating without significant limp."

The second, also in its entirety states:

"The above captioned patient was last seen in this office on December 10. At that time he had no symptoms whatsoever. He still had a slight limp. I would expect his limp to continue for a short period. Brian's limp should disappear as he becomes more confident.

"I do not believe he needs physiotherapy or any other means to treat the patient's limp as it will improve and he should have absolutely no limp or disability or for that matter residua from his accident in the future.

"As to psychological implications, I believe the patient is a very healthy young man coming from what appears to be a stable family and as near as I can determine I do not believe there will be major psychological difficulties which could be directly related to the accident."

Based upon these reports, Allstate negotiated with plaintiff's parents and offered $7,500 in settlement, claiming this to be a fair and reasonable sum.

In truth and fact the injuries of plaintiff were *"known or should have been known* in the exercise of reasonable care by the Defendant . . . *to be of a potentially more serious nature* with reference to future impairment, disability, and residua, than reported . . ." (italics added) by the defendant. Such conduct of the defendant was "wilful, intentional and negligent."

"[A]s a direct and proximate result of the conduct and negligence of the Defendant, . . . Plaintiff . . . suffered damages [in the form of attorney fees and litigation costs totalling $3,897.11], which attorney's fees and litigation costs were incurred in order to secure a more advantageous resolution of the said uninsured motorist claim . . . that said claim was settled for the full policy limits . . . ($15,000) after retained counsel convinced Allstate . . . that the subject medical reports . . . were *erroneous, unduly conservative,* and inconsistent with the sequel and

residuals which are *ordinarily* known to follow injuries of the type sustained by the minor . . . ." (Italics added.)

The foregoing allegations constitute essentially all of the first count. It is noteworthy that there is no claim or allegation of fraud or deceit on the part of the defendant (neither the majority nor I would dignify the phrase "wilful, intentional and negligent" as even approximating an adequate allegation of fraud), nor is there any mention of conspiracy or collusion with Allstate. I also point out the highly conspicuous absence of two other allegations normally included in a negligence pleading. First, the count nowhere alleges that the plaintiff *in fact* had residual injury more severe than that contained in the reports; the emphasized portions of the complaint (to wit, that the injuries were known or should have been known to be of a *potentially* more serious nature, and that the medical reports were inconsistent with the residuals which are *ordinarily* known to follow such injuries) demonstrate an obviously deliberate effort to not plead a residual limp or any other permanent physical condition of this plaintiff. Second, there is no allegation that if the report had been written otherwise, Allstate would have offered its $15,000 policy limits. These two latter omissions are important to my discussion of proximate cause.

## II

This court's research has disclosed no prior case in California (or elsewhere in the United States) in which the subject matter of the first count was ruled upon.[2] Thus the majority, in a case of first impression, has extended the scope of recovery of financial (not physical injury) damages under traditional negligence concepts to a treating physician's act of rendering a written medical opinion on his patient's physical condition. It has done so without devoting the slightest comment to the

---

[2]*Keene* v. *Wiggin* (1977) 69 Cal.App.3d 308 [138 Cal.Rptr. 3], relied upon by plaintiff, is not in point. The suit there was filed by an injured employee against a doctor who examined him for the employer's worker's compensation carrier. The doctor's report recommended no treatment or surgery, and plaintiff claimed he relied upon it "to his detriment." The Court of Appeal upheld summary judgment for the doctor, finding no patient relationship, and hence no duty of care. The differences between that case and this are too obvious to warrant discussion.

*Rosenthal* v. *Blum* (Tex.Civ.App. 1975) 529 S.W.2d 102 is also not in point, for it was founded upon a theory of negligent misrepresentation, an element of which is reliance (plaintiff there relied on the doctor's report and settled his case for an insufficient sum, claiming as damage the difference between that sum and the true value of his case). Here we obviously have no reliance by plaintiff. Even so, my analysis would not permit recovery on those facts either.

socio-economic consequences of, and the public policy considerations affecting, such a significant expansion of professional liability.

Necessarily my analysis begins with the concept of legal duty, the duty of care which definitionally is essential to the tort of negligence. (Rest.2d Torts, § 281 et seq.) "In the consideration of a general demurrer or motion for nonsuit in a negligence action, the dispositive issue is usually the legal question of duty, not the fact question of proximate cause. [Citation.] . . . 'Divergent results are possible and judicial disagreements arise by approaching negligence determinations through the gateway of duty, on the one hand, or proximate causation on the other.' " (*Fuller* v. *Standard Stations, Inc.* (1967) 250 Cal.App.2d 687, 692 [58 Cal.Rptr. 792].)

Justice Friedman's words on the concept of duty are highly appropriate.

"According to current California negligence doctrine, reasonable foreseeability of harm is the initial, court-determined test of a duty of care; secondarily, a series of policy factors moves the courts to decide, as a matter of law, whether to accord protection to the particular plaintiff. (*Weirum* v. *R K O General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]; *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399 [115 Cal.Rptr. 765, 525 P.2d 669]; *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 739-741 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

"In *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8 [31 Cal.Rptr. 847], this court sought to capsulize the array of policy considerations underlying the duty of care issue: 'The social utility of the activity out of which the injury arises, compared with the risks involved in its conduct; the kind of person with whom the actor is dealing; the workability of a rule of care, especially in terms of the parties' relative ability to adopt practical means of preventing injury; the relative ability of the parties to bear the financial burden of injury and the availability of means by which the loss may be shifted or spread; the body of statutes and judicial precedents which color the parties' relationship; the prophylactic effect of a rule of liability; in the case of public agency defendant, the extent of its powers, the role imposed upon it by law and the limitations imposed upon it by budget; and finally, the moral imperatives which judges share with their fellow citizens—such are the factors which play a role in the determination of duty.' The duty factors

have been grouped into moral, administrative and socioeconomic categories. (*Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 309-315 [29 Cal.Rptr. 33, 379 P.2d 513], overruled on other grounds in *Dillon* v. *Legg, supra*; see generally, Green, *The Duty Problem in Negligence Cases* (1928) 28 Colum.L.Rev. 1014; (1929) 29 Colum.L.Rev. 255.)" (*Kindt* v. *Kauffman* (1976) 57 Cal.App.3d 845, 867 [129 Cal.Rptr. 603].)

This accords with the view of the Supreme Court. "We depart from 'this fundamental principle' [that liability is imposed for injury occasioned by the defendant's want of ordinary care and skill] only upon the 'balancing of a number of considerations'; major ones 'are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.'" (*Tarasoff* v. *Regents of the University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334].)

My dissent perforce asserts that there is no duty on the part of a physician to his patient to write a nonnegligent medical report. To persons trained in the law, the instinctive reaction is that in view of the physician-patient relationship, with all that that imports, such a suggestion is untenable. However, upon reasonable reflection, it will be seen to be no less untenable here than in numerous other situations in which for sound reason a duty of care has been judicially rejected. For example, a would be tortfeasor owes no duty to the parents of a child injured in their presence not to thereby inflict emotional distress (unaccompanied by physical injury) upon them (*Capelouto* v. *Kaiser Foundations Hospital* (1972) 7 Cal.3d 889, 892, fn. 1 [103 Cal.Rptr. 856, 500 P.2d 880]; *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 740 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]); a would be tortfeasor owes no duty to an employee of a person whose place of business he destroys to refrain from such destruction and from thereby causing the employee to suffer a loss of his employment and the earnings therefrom (*Fifield Manor* v. *Finston* (1960) 54 Cal.2d 632 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813]; *Adams* v. *Southern Pac. Transportation Co.* (1975) 50 Cal.App.3d 37 [123

Cal.Rptr. 216]); a would be tortfeasor owes no duty to parents who are not present at the time of injury to their child to refrain from negligently injuring the child, where the parents suffer physical injury from the shock and emotional distress they thereby experience (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 76 [137 Cal.Rptr. 863, 562 P.2d 1022]; *DeBoe* v. *Horn* (1971) 16 Cal.App.3d 221 [94 Cal.Rptr. 77]; *Powers* v. *Sissoev* (1974) 39 Cal.App.3d 865 [114 Cal.Rptr. 868]); a would be tortfeasor has no duty to refrain from causing a loss of affection and society (as distinguished from loss of earnings and services of economic value) to parents by negligently killing their child (*Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871]); a tavernkeeper owes no duty to a drunk patron to refrain from violating a statute prohibiting the service of alcoholic beverages to such patron, where such statutory violation causes subsequent injury to the patron (*Kindt* v. *Kauffman, supra*); an attorney owes no duty to use ordinary care in giving legal advice to persons who rely upon it but who are not his clients (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335 [134 Cal.Rptr. 375, 556 P.2d 737]).

The difficulty with the duty concept in torts is that the word itself tends to confuse the true objective of the law, which is to sensibly, practically, and wisely delineate those misdeeds for which a recovery of money damages will be allowed. In the moral sense, we all owe a duty not to ever do that which may in any manner injure or damage anyone else. All the defendants in the above examples (and in many others) where recovery has been denied breached a duty in this moral sense. But our judicial concern is with a *legal* rather than a moral duty. In truth the word is a misnomer; for when the appellate courts or the Legislature (see, e.g., Bus. & Prof. Code, § 25602 and *Vesely* v. *Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151]; for legislative *limitation* on liability, see, e.g., Health & Saf. Code, § 1606) recognize a right of recovery for an unintentionally caused injury, we declare that a duty exists; conversely where a right of recovery is denied, we find no duty. In neither case do we consider the word in its commonly understood sense.

Prosser expresses the problem in a highly articulate manner. "This concept of a relative duty is not regarded as essential by the continental law, and it has been assailed as serving no useful purpose, and producing only confusion in ours. [Fn. omitted.] Its artificial character is readily apparent; in the ordinary case, if the court should desire to find liability, it would be quite as easy to find the necessary 'relation' in the position of

the parties toward one another, and hence to extend the defendant's duty to the plaintiff. [Fn. omitted.] The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. [Fn. omitted.] It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. It is embedded far too firmly in our law to be discarded, [fn. omitted] and no satisfactory substitute for it, by which the defendant's responsibility may be limited, has been devised. [Fn. omitted.] *But it should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection."* (Italics added.) (Prosser, Law of Torts (4th ed. 1971) § 53, pp. 325-326.)

## A

With this concept of duty in mind, I turn to the considerations furnished by the *Tarasoff* case for guidance in determining whether liability should be imposed. They are once again: (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered injury, (3) the closeness of the connection between the defendant's conduct and the injury suffered, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden to the defendant and consequences to the community, and (7) the availability, cost and prevalence of insurance for the risk involved. I shall discuss each of them in order.

### 1.

*The foreseeability of harm to the plaintiff.* Although a plausible argument can be made that generally a physician[3] does not reasonably foresee that his medical report may bring about a damage to his patient by way of unnecessary legal fees, I cannot deem such a result unforeseeable as a matter of law. This criterion is therefore satisfied.

---

[3]Although throughout this opinion I use the word "physician" or "doctor" to illustrate my discussion, each consideration applies with equal force to doctors of medicine, chiropractors, osteopaths, dentists, podiatrists, physical therapists, laboratory technicians, nurses, hospitals, clinics, and all other practitioners of the healing arts.

## 2.

*The degree of certainty that the plaintiff suffered injury.* As more explicitly pointed out hereinafter in my discussion of proximate cause, there is no such certainty. It is utter speculation to maintain that the form of the medical report, rather than a number of other considerations, mostly subjective, will bring about an acceptable or an unacceptable offer from an insurance company, thus necessitating the retention of attorneys.

## 3.

*The closeness of the connection between the defendant's conduct and the injury suffered.* Both conceptually and practically, the two are substantially removed from one another in this case. Where the doctor carelessly treats his patient's ailment, it is axiomatic that the patient suffers direct harm. Where the doctor writes a report *to his patient* wherein he carelessly gives poor or faulty medical advice, and the patient acts in reliance thereon and suffers aggravation of his physical condition (cf. *Keene* v. *Wiggin* (1977) 69 Cal.App.3d 308 [138 Cal.Rptr. 3]), although the harm is less directly related to the negligent act, it is nonetheless sufficiently close to meet this guideline. But where we go from a medical report allegedly negligent because conservative in its prognosis, to harm in the form of attorney fees incurred to obtain a monetary recovery from a third person, the connection between the act and the result is both highly indirect and terribly remote, far too tenuous to be within this guideline of *Tarasoff.*

## 4.

*The moral blame attached to the defendant's conduct.* I view the physician (as we all do) as having a duty to heal his patient and to competently devote all the resources of his profession to this cause; for a breach of that obligation, I assess serious moral blame. But a doctor is not and never was meant to be a writer. For having negligently written a report, or more appropriately for having written such a report "conservatively," a doctor incurs no moral blame.

## 5.

*The policy of preventing future harm.* The plaintiff would argue that recognition of liability will cause doctors to be more careful in writing

their medical reports, thus preventing loss of adequate settlement moneys by their patients and avoiding attorney fees. This necessarily implies that there will be more settlements and less litigation. Upon reflection however, the contention is seen to be fatuous. In reality, if after this decision a plaintiff's doctor writes any report at all, in self-defense he will write it "liberally," not "carefully." He will tend to exaggerate the extent of injury rather than express a sincere opinion thereon. His counterpart, the defense examiner, will write his report "conservatively" not "carefully," in order to avoid liability to the defendant with whom he is in privity. Each side will soon know what the other is doing. Is future harm thus prevented? On the contrary, candor and truth are suppressed, creating rather than preventing future harm in the form of fewer settlements, more litigation, and of course more attorney fees. In actuality, no matter what a plaintiff's doctor states in a report, no degree of care will prevent a lawsuit against him; if the case is settled without an attorney, rarely is the settlement adequate to the plaintiff (this reality is too well known to any practicing lawyer to require citation or documentation) so that a lawsuit is in order. Whatever doctors write, no matter how diligent or careful they try to be, the issue of whether their reports are liberal, conservative, or otherwise negligently inappropriate will always be the subject of differences in point of view and consequent prolific litigation. Furthermore there is no reason to expect that liability for negligent reports will be limited to cases where the injured person is dealing directly with the insurance company. Even after a lawyer is retained by the plaintiff, a report to him can be just as negligent and the settlement (or even conceivably the amount recovered at trial) can be claimed to be just as inadequate on account of it.

6.

*The extent of the burden to the defendant and the consequences to the community.* This is the most important consideration of all. Essentially it involves those factors which have been grouped into "moral, administrative and socioeconomic categories." (See *Amaya, supra,* 59 Cal.2d at pp. 309-315.)

In the years 1974 and 1975, this state, along with much of the country, experienced what became known as the "Medical Malpractice Crisis." The controversy reached a point where on May 19, 1975, our Governor deemed it appropriate to issue a proclamation, in connection with which he called the Legislature into extraordinary session. The proclamation in

part reads as follows: "The cost of medical malpractice insurance has risen to levels which many physicians and surgeons find intolerable. The inability of doctors to obtain such insurance at reasonable rates is endangering the health of the people of this State, and threatens the closing of many hospitals. The longer term consequences of such closings could seriously limit the health care provided to hundreds of thousands of our citizens. [¶] In my judgment, no lasting solution is possible without sacrifice and fundamental reform. It is critical that the Legislature enact laws which will change the relationship between the people and the medical profession, the legal profession and the insurance industry, and thereby reduce the costs which underlie these high insurance premiums." (Stats. 1975 p. 3947.) The Legislature went into session and enacted the "Medical Injury Compensation Reform Act," (Stats. 1975, Second Ex. Sess., ch. 1, art. 11) which went into effect on September 23, 1975.

The "crisis" was the result of an overabundance of malpractice litigation, and it is obvious from a reading of the full content of the Governor's proclamation and also of the reform act itself that the Legislature undertook to solve it by limiting and reducing such litigation. From this I deduce a public policy discouraging claims and lawsuits, at least marginal claims and lawsuits, against doctors arising out of their relationship with patients. Moreover there has always existed in the common law the public policy of avoiding litigation wherever reasonably possible. (See Witkin, Cal. Evidence (2d ed. 1966) Circumstantial Evidence, § 378, p. 336; Evid. Code, § 1152.)

Mindful of such public policy, I now consider the practical effect of the majority's holding upon the medical profession and the community. Thousands of injury claims are settled annually by the use of medical reports. These include not only tort claims but also worker's compensation, disability retirement, social welfare, medicare, health and accident insurance, and the like. Since doctors, nurses, hospitals, physical therapists, and others in the healing arts may now be sued because they write medical reports "negligently," such of these as are possessed of normal mental faculties and a moderate instinct for self-preservation will henceforth think seriously before writing them. As above noted, they will discern that since negligence in the manner in which they articulate their diagnosis or prognosis is a matter of opinion, no amount of care will avoid a lawsuit. Consequently their inclination to render medical reports

will abate[4] and the use of reports will be severely curtailed.[5] The result to the insurance industry, to the legal profession, to courts and administrative bodies, and to the public will be devastating. Medical information itself will become the subject of litigation, or at least formal discovery, before the parties will have the necessary facts upon which to even negotiate a claim. The majority's opinion effectively and practically takes away from lawyers, insurance companies, worker's compensation judges, administrative tribunals, and others (including sometimes courts and juries) a highly practical and inexpensive tool for the resolution of claims, all of which must now be litigated to the most minute extent. What the executive and the legislative departments of our government did in 1975 to reduce litigation and thus decrease the public cost of medical treatment has been largely undone by this court today.

The medical profession does not merit this further exposure to liability.[6] The public cannot afford it (we may be certain that its enormous cost, both direct in the form of increased liability insurance premiums and indirect in the form of increased costs resulting from the curtailed use of medical reports, will be passed on to the public). This new and fertile source of litigation will aggravate an already unduly strained relationship between doctors and lawyers on the one hand and doctors and patients on the other. It will certainly do nothing to further the public policy evidenced by the reform act.

Today we approve this plaintiff's claim for damages against his doctor because the doctor's report was too conservative. It follows of course that tomorrow we will approve a suit claiming that a medical report was negligent because too liberal. Today the case involves damages in the form of attorney fees. Tomorrow the damages will take a different form (but still will involve injury to the pocketbook, not physical injury), such as an inadequate or overgenerous settlement where settlement has in fact been made, or too large or too small a jury verdict brought about because no settlement was made. I can even foresee a claim that the doctor's negligent report prevented a settlement, necessitating the

---

[4]The Hippocratic oath of the medical profession requires treatment of those afflicted by physical ailment and imposes other affirmative duties, but nowhere does it direct or even counsel the writing of medical reports.

[5]Another very probable consequence is that the doctor's charges for medical reports will substantially increase, purportedly to cover this new risk.

[6]"Traditionally, the practice of medicine has not had an adversary flavor, a tradition that continues today. Unfortunately, much of a physician's involvement with a patient pressing an accident claim necessarily assumes an adversary flavor. . . ." (Fox, The Medicolegal Report, § 3.1, p. 9.)

retention of an attorney; that the attorney then damaged the plaintiff by an act of legal malpractice resulting in no recovery; that the attorney cannot respond in damages because he carried no malpractice insurance; that since the lawyer's malpractice would not have occurred but for the doctor's report, the doctor should now pay for the lawyer's incompetence. None of these hypothetical damages are any more speculative than those asserted here.[7]

Moreover, by its very nature the subject matter of the tortious act itself is speculative. What is a "negligent" medical report? What language are doctors supposed to use in reporting on their patients' condition? As a practitioner of law for 20 years, as well as in my capacity as trial court judge and appellate court judge, I have read hundreds of medical reports from hundreds of doctors, each in its own style, some literarily good, others very poor, some practically incoherent. The majority's opinion in effect tells the medical profession to go to a separate school or take separate training in the writing of medical reports; yet neither of these will prevent this type of lawsuit. This extension of tort liability will be abused intolerably, and from it the general public stands to gain nothing. All I can see ahead is mischief in the form of huge numbers of unwarranted claims and lawsuits, an enormous increase in court congestion, further antipathy between the medical and legal professions, worsened doctor-patient relationships, and a further and greater financial burden upon patients generally, and upon taxpayers.

7.

*The availability, cost and prevalence of insurance for the risk involved.* There is no evidence in the record on this subject and I cannot therefore determine the extent to which such insurance is available. As I read the pertinent provisions of the Insurance Code (Ins. Code, § 108, subd. (d) and § 11890, subd. (2)),[8] coverage for the risk in question is not legally required; whether it is furnished in existing policies or not I cannot know.

---

[7]I am troubled by yet another implication of this holding. A medical prognosis is nothing more than an opinion. There is no difference between a written and an oral prognosis or other opinion; therefore a doctor (or any other expert, e.g., appraiser, economist, plumber, accident reconstruction expert) can now be sued for a negligent opinion rendered at a deposition or even on the witness stand at a trial. The implications are staggering.

[8]Insurance Code section 108 reads in pertinent part: "Liability insurance includes: . . .

"(d) Insurance coverage against the legal liability of the insured, and against loss, damage, or expense incident to a claim arising out of the *death or injury* of any person as

Assuming however that coverage for such risk has been and is available, until this case it could not have been very costly. After this case, with the volume of added litigation I foresee, the additional cost of such coverage will more than offset any public advantage gained by the Medical Injury Compensation Reform Act.

### B

The substantial majority of *Tarasoff* factors, when individually analyzed as above, lead me to conclude that we should not judicially allow tort liability for negligent medical reports. I have emphasized those public policy considerations which militate against the majority's decision; I know of none to support it.

### III

Even under traditional tort concepts, there is a basic and fundamental reason why the first count states no cause of action. Proximate cause, i.e., a legally adequate causal relationship between the negligent medical report and the attorney fee which is claimed to constitute the damage, is not pleaded. Its absence is noted in two ways. First, as earlier noted, the complaint does not assert and in fact deliberately avoids asserting that plaintiff's residual injury in fact was any greater than that described in the reports. Since it was not, plaintiff cannot claim any damage attributable to the reports.[9] That more serious residuals "ordinarily" follow injuries of the type suffered by plaintiff, or that his injuries were "potentially" of a more serious nature, avails plaintiff nothing, as it is his injuries alone that are involved in the litigation. Second, there is absent an allegation that the insurance company, Allstate, would have offered the full $15,000 of its policy had the medical reports been written less conservatively. Plaintiff has not pleaded this, because as an able and astute practitioner of personal injury law, his counsel cannot in good conscience plead it, even in an unverified complaint. Lawyers expe-

---

the result of negligence or malpractice in rendering professional services by any person who holds a certificate or license . . . ." (Italics added.)

Insurance Code section 11890 reads in pertinent part: "As used in this article: . . .

"(2) 'Medical malpractice insurance' means insurance coverage against the legal liability of the insured and against loss, damage, or expense incident to a claim arising out of the *death or injury* of any person as the result of negligence or malpractice in rendering professional service by any licensee." (Italics added.)

[9]Perhaps a better way of putting it is that since no more serious injury is alleged, the reports were truthful and accurate, hence not negligent.

rienced in negotiation and settlement of personal injury cases know well that in settlement negotiations insurance companies are unpredictable. Had the reports in question contained a prognosis suggesting that the plaintiff would have a permanent residual limp, even then no one can seriously assert that Allstate necessarily would have offered the full $15,000.[10] While this might be a jury question, the plaintiff must nonetheless plead it as a proximate cause (Rest.2d Torts, § 435.) No such direct pleading is made and none can be implied from the facts pleaded. Again I refer to the medical reports themselves as well as to the other factual allegations of the complaint. We infer from language of a pleading matters which in normal and logical sequence follow from the allegations. The allegations here do not in any way suggest an inference that Allstate would have acted otherwise than it did if the report had been written less conservatively.

The proximate cause defect in count one may be summarized as follows. When this or any other court holds that a given complaint states a cause of action, it in effect affirms that if the plaintiff proves everything he has alleged, he will obtain the relief he seeks, in this case $3,897.11. Thus under the majority's holding, if this plaintiff proves item by item, fact by fact, everything that he has alleged, he is entitled to receive judgment for $3,897.11. After the majority's ruling, let us assume that at trial plaintiff proves what he has pleaded, viz., that he was injured, that he went to the defendant doctor who treated him, that the doctor wrote the two medical reports in question, that the reports did not describe the seriousness of the injury accurately and the doctor should have known this, that on the strength of these reports Allstate offered $7,500, and that the $7,500 was offered because of the way the medical reports were written. Let us assume further that plaintiff does not prove what he did not plead, viz., that Allstate would have offered the full $15,000 if the report had been written otherwise. Under such circumstances the majority would endow the plaintiff with $3,897.11. I cannot believe that the law permits this, because with everything that plaintiff will have proven, he will not have proven proximate cause, so vital to recovery in tort.

---

[10]"Insurance carriers generally tend to 'downgrade' claims, either to reject them outright or to reduce the amount that must be paid. Of course, our economic and social system sanctions these efforts because insurance companies are not charitable institutions, but operate in a price and profit economy, as do other industrial corporations." (Fox, The Medicolegal Report, § 3.1, p. 9.)

## IV

Plaintiff did not purport to sue on a general negligence theory but rather on a malpractice theory. By labeling his complaint "First Amended Complaint for Medical Malpractice Based Upon Tortious Conduct Only," and by alleging that the defendant was hired not only to diagnose and treat plaintiff but also to prepare the subject medical reports, the plaintiff obviously restricted himself to a medical malpractice claim, with all that that entails. Yet the majority, ignoring the plaintiff's position in this regard, has awarded him a cause of action in general negligence. In doing so, the majority retreats from the "rule of law" and hastens the day when "principled decision will have been replaced with decision by whim, and the common law of negligence will have degenerated into an unjustifiably inefficient, thinly disguised lottery." (Henderson, *Expanding the Negligence Concept: Retreat from the Rule of Law* (1976) 51 Ind.L.J. 467, 468. See also Pearson, *The Role of Custom in Medical Malpractice Cases* (1976) 51 Ind.L.J. 528.)

On a general negligence theory, plaintiff need only submit his facts to the jury and let it determine whether negligence was present. No professional standard of care is involved. Under a malpractice theory, however, the method of writing a medical report and expressing a medical opinion therein would be the subject of the professional standard of care of doctors in the community. Liability would be measured by such a standard rather than by whatever standard a lay jury chooses to apply. Moreover, proof of the standard would have to be by expert testimony of other physicians (see *Brown* v. *Colm* (1974) 11 Cal.3d 639, 642-643 [114 Cal.Rptr. 128, 522 P.2d 688]; *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 410 [131 Cal.Rptr. 69, 551 P.2d 389]).

Not only should the latter alternative obtain because the plaintiff has proceeded on the basis of professional malpractice, but also because it would place this form of liability on a foundation far more fair and equitable to the physician. "Nowhere . . . either in medical school or postgraduate training, is specific attention devoted to . . . the composition of medical reports. To the writer's knowledge, which is based on extensive inquiry of the medical profession, no medical school has a course on writing medical reports—at least, with regard to the insurance claim. Furthermore, it does not appear that attention has been given to the problem of writing such reports at any national, regional, or local medical convention." (Fox, The Medicolegal Report, § 1.1, p. 2.)

Thus the doctor, whose function is to treat rather than to write, should not be subjected to liability for faulty writing unless members of his own profession are prepared to testify that a duty of faultless writing is included in his standard of care. In his professional liability to his patient the doctor should be treated as a professional.