[No. A024548. First Dist., Div. Three. Nov. 8, 1985.]

FRANCES M. CLARKE, Plaintiff and Appellant, v.
KENNETH J. HOEK, Defendant and Respondent.

210

---

**COUNSEL**

Scott D. Righthand and Bostwick & Tehin for Plaintiff and Appellant.

Stuart M. Gordon, Nancy E. Hudgins, Thomas A. Packer, Bradford W. Lomas and Gordon & Rees for Defendant and Respondent.

James E. Ludlam, Musick, Peeler & Garrett, David E. Willett, Catherine I. Hanson and Hassard, Bonnington, Rogers & Huber as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**SCOTT, J.—** The issue raised here is whether a physician who, on behalf of a hospital and without compensation, acts as a proctor in observing a surgical operation for the sole and express purpose of assessing and reporting on the competence of a candidate for membership of a hospital medical staff, owes a duty of care to the patient in the operation which would render the proctor subject to liability for failing to intervene in that surgery in order to prevent malpractice by the proctored surgeon. The question is posed in the context of an appeal from an order granting summary judgment in favor of a physician who served as the proctor on behalf of two hospitals in two separate operations on the same patient. We conclude that the respondent proctor had no duty of care to the patient. We therefore affirm the order of summary judgment.

### I

There is no dispute as to any of the material facts. At all relevant times, Kenneth J. Hoek, M.D. (Dr. Hoek) was a physician and surgeon licensed since 1968 to practice in California, and certified since 1976 by the American Board of Orthopedic Surgery. Dr. Hoek acted as proctor during two separate orthopedic surgeries performed on appellant Frances M. Clarke by Drs. Frank LoBianco (Dr. LoBianco) and William Mason (Dr. Mason), during the course of which appellant was allegedly injured as a result of the negligence of the two surgeons.

 ██ Dr. Hoek was an active medical staff member of both the Ukiah Adventist Hospital and the Mendocino Community Hospital.[1] On or about October 19, 1979, Dr. Hoek was appointed by the joint credentials committee of Ukiah General and Ukiah Adventist Hospitals to be a proctor for Dr. LoBianco, who was an applicant for medical staff privileges at Ukiah Adventist Hospital. Dr. Hoek was never asked to proctor Dr. Mason. In accordance with the bylaws of the Ukiah Adventist Hospital, Dr. Hoek was asked to observe 10 surgeries performed by Dr. LoBianco and then to submit a written report to the credentials committee. On February 8, 1980, Dr. Hoek was present at and observed an operation performed on appellant by Drs. LoBianco and Mason at Ukiah Adventist Hospital.

Sometime thereafter, Dr. Hoek was again asked to proctor Dr. LoBianco, this time at Mendocino Community Hospital. The bylaws of the Mendocino

---

[1]A "staff physician" is one who has been accorded "staff privileges" at a hospital, ordinarily for a period of not more than two years. A physician must be a member of a hospital's medical staff to admit patients to that hospital. (*Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332, 337, fn. 4 [183 Cal.Rptr. 156].)

Community Hospital, like those of the Ukiah Adventist Hospital, provided that proctors were to prepare written reports after observing and evaluating all aspects of an applicant's management of a case. Dr. Phranklin Apfel, chief of staff at Mendocino Community Hospital, asked Dr. Hoek to observe 10 surgeries performed by Dr. LoBianco and to submit a report. On May 21, 1980, Dr. Hoek was present at and observed surgery performed on appellant by Drs. LoBianco and Mason at Mendocino Community Hospital.

Prior to each of the two operations, Dr. Hoek reviewed appellant's X-rays and discussed the operative plan with Dr. LoBianco. Otherwise, Dr. Hoek did not take any part in the care and treatment of appellant. During the actual operations, he did not participate in the surgeries; nor was he ever asked to do so by appellant, any medical personnel, or any hospital official. Dr. Hoek did not believe that such intervention was warranted. He did not "scrub in" for the surgeries; rather, he simply observed them from a position outside "the sterile field."

As of the times of the subject surgeries, Dr. Hoek had never met appellant; neither had he entered into any contractual relationship with her. He did not request, receive or expect any payment from any source for proctoring the two operations. His only direct contact with appellant was on February 4, 1981, many months after the two surgeries, at which time appellant consulted him for an evaluation of the condition of her feet. Appellant had been referred to Dr. Hoek by her family physician. She did not enter into any contract or agreement with Dr. Hoek in connection with her treatment, and she has not made any allegations that his evaluation of her condition was performed negligently.

In declarations filed by respondent in connection with his motion for summary judgment, Drs. Phranklin Apfel and James T. Alexander, the respective chiefs of staff of the two hospitals at the times of appellant's operations, declared that their hospitals, like all others, are required to evaluate the competence of physicians who are applicants for medical staff privileges. In the case of a surgeon, competency is determined by the physician's application, credentials, references, reports of prior surgeries, and observation by proctors of the candidate at work. According to the hospital chiefs of staff, proctors are responsible only to the medical staff credentials committee of the hospital charged with peer review. Proctors are only required to *observe* the candidate for medical staff membership at work and report back to the credentials committee; they are not expected to supervise the physicians being proctored or to intervene in proctored surgeries. Furthermore, Drs. Apfel and Alexander declared that imposition of tort liability on individual proctors for the alleged malpractice of the physicians being proctored would inhibit and stifle effective peer review by proctors, who perform their

proctoring duties as unpaid volunteers. These statements were also supported by the declarations of two other physicians.

The only evidence that appellant submitted to the court in connection with her opposition to respondent's motion for summary judgment consisted of the declarations of two medical consultants, Drs. Joshua Gerbert and Edward T. Kelley, and excerpts from the deposition of Dr. Mason. In their declarations, Drs. Gerbert and Kelley opined that any proctor to a surgical operation owes a duty to the patient "to ensure that the patient receives proper surgical treatment within the standard of care," and to intervene in the surgery he is proctoring if he determines that the surgical procedure "falls below the standard of care" or is being "improperly performed." In his declaration, Dr. Gerbert further stated that a proctor has a duty to review applicable intraoperative X-rays; "to instruct the surgeons to remedy difficulties perceived" thereby; to intervene himself if the operating surgeons fail to remedy the difficulties; and "to ensure" both that the operative procedures performed are those consented to by the patient on his or her consent form, and that they are competently performed. Although Dr. Gerbert does not set forth the practical means whereby a proctor is to carry out these alleged duties "to ensure" that the operative procedures were consented to and are performed competently, he does state that, in his opinion, Dr. Hoek "breached the standard of care" by not doing so.

In the excerpts taken from his deposition, Dr. Mason testified that he had "proctored many people many times" and had never intervened in a surgery; nor had he ever heard of a proctor intervening in a surgery. He could envision "extreme cases of poor surgical judgment or poor surgical performance" in which "it would be my job as a proctor to intervene and try to give the surgeon appropriate advice that he or she needs"; however, "the proctor is usually not scrubbed into the case so you can't get your hands involved in the surgery. . . . And the patient is under a general anesthetic and unless under [sic] a situation where the patient is under a local anesthetic, you certainly wouldn't want to stop the surgery cold. Most physicians tend to be reasonable."

## II

▮ The question of the existence of a legal duty of care in a given factual situation presents a question of law which is to be determined by the courts alone. (*Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at p. 339; *Peter W.* v. *San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 822 [131 Cal.Rptr. 854]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 493, p. 2756.) Since the existence of a duty of care is an essential element in any assessment of liability for negligence (*United States Liab.*

*Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770]; *Hooks* v. *Southern California Permanente Medical Group* (1980) 107 Cal.App.3d 435, 443 [165 Cal.Rptr. 741]; *Peter W.* v. *San Francisco Unified Sch. Dist., supra,* 60 Cal.App.3d at p. 822; 4 Witkin, *op. cit. supra,* Torts, § 488, p. 2749), entry of summary judgment in favor of the defendant in a negligence action is proper where the plaintiff is unable to show that the defendant owed such a duty of care. (*Rainer* v. *Grossman* (1973) 31 Cal.App.3d 539, 542 [107 Cal.Rptr. 469].) In this case, if respondent's declarations in support of the motion for summary judgment demonstrate an absence of an essential element of appellant's case, and appellant's declarations submitted in reply do not show that a triable issue of fact exists with respect to that essential element, "no amount of factual conflicts upon other aspects of the case will affect the result and the motion for summary judgment should be granted." (*Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland, Teerlink & Bell* (1977) 70 Cal.App.3d 331, 338 [138 Cal.Rptr. 670].)

 Despite appellant's assertions on appeal, there were no triable issues of material fact which would bar the grant of summary judgment. The alleged "conflicts" in the evidence before the court at the time of the hearing on the motion were actually divergent opinions on whether or not Dr. Hoek owed a duty of care to appellant in his role as a medical proctor. The fact that appellant's doctor experts opined that Dr. Hoek had a duty to "ensure that the patient receives proper surgical treatment within the standard of care" and that failure to intervene falls below the standard of care, does not create a triable issue of fact. The doctor's opinion as to Hoek's duty is erroneous as a matter of law. There can be no issue of fact as to whether Hoek discharged such "duty."

Appellant seeks to inject the issue of foreseeability into that of duty and argues that since foreseeability is a question of fact for the jury, the trial court's granting of summary judgment was improper. Although the element of foreseeability of unreasonable risk is a factor determining the existence of a duty of care (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]), this does not make the determination of duty a question of fact. While it is the province of the jury, as trier of fact, to determine whether an unreasonable risk of harm was foreseeable under the particular facts of a given case, the trial court must still decide as a matter of law whether there was a duty in the first place, even if that determination includes a consideration of foreseeability. (*Stout* v. *City of Porterville* (1983) 148 Cal.App.3d 937, 941 [196 Cal.Rptr. 301]; *Peter W.* v. *San Francisco Unified Sch. Dist., supra,* 60 Cal.App.3d at pp. 822-823.) The fact that harm to a plaintiff may have been foreseeable does not automatically impose a duty. A court may find that no duty exists,

despite foreseeability of harm, because of other factors and considerations of public policy. (*Brousseau* v. *Jarrett* (1977) 73 Cal.App.3d 864, 880, 886 [141 Cal.Rptr. 200].)

█ Moreover, the rule that conduct is negligent where some unreasonable risk of danger to others would have been foreseen by a reasonable person is applicable only to cases of misfeasance. Absent a special relationship giving rise to a duty to act, a person is under no duty to take affirmative action to assist or protect another, no matter how great the danger in which the other is placed, or how easily he could be rescued. (Rest.2d Torts, § 314; *Williams* v. *State of California* (1983) 34 Cal.3d 18, 23-24 [192 Cal.Rptr. 233, 664 P.2d 137]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435-437 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; *Scott* v. *Farrar* (1983) 139 Cal.App.3d 462, 466 [188 Cal.Rptr. 823]; *Beauchene* v. *Synanon Foundation, Inc.* (1979) 88 Cal.App.3d 342, 347 [151 Cal.Rptr. 796]; *Winkelman* v. *City of Sunnyvale* (1976) 59 Cal.App.3d 509, 512 [130 Cal.Rptr. 690]; 4 Witkin, Summary of Cal. Law, Torts, *supra*, § 554, p. 2821.)[2] A corollary of this principle is that an individual is under no duty to control the conduct of third parties unless a special relationship exists between the individual and either the third parties or the persons affected by their conduct. (Rest.2d Torts, § 315; *Weirum* v. *RKO General, Inc.*, *supra*, 15 Cal.3d at pp. 48-49.) Conversely, if a person not required to perform services for another nevertheless undertakes to do so, he or she is under a duty to exercise due care in performance of those services. (Rest.2d Torts, §§ 323, 324; *Williams* v. *State of California, supra,* 34 Cal.3d at p. 23; *Perry* v. *D. J. & T. Sullivan, Inc.* (1933) 219 Cal. 384, 389 [26 P.2d 485]; *Griffin* v. *County of Colusa* (1941) 44 Cal.App.2d 915, 922-923 [113 P.2d 270]; 4 Witkin, *op. cit. supra*, § 557 at p. 2823.)[3] █ "This doctrine is rooted in the common law distinction between action and inaction, or misfeasance and nonfeasance. Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention.

---

[2]Section 314 of the Restatement Second of Torts states: "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."

[3]"As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act. [Citations.] Also pertinent to our discussion is the role of the volunteer who, having no initial duty to do so, undertakes to come to the aid of another—the 'Good Samaritan.' He is under a duty to exercise due care in performance and is liable if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking. [Citation.]" (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 23.)

. . . [L]iability for nonfeasance is largely limited to those circumstances in which some special relationship can be established. If, on the other hand, the act complained of is one of misfeasance, the question of duty is governed by the standards of ordinary care . . . ." (*Weirum* v. *RKO General, Inc.,* *supra,* 15 Cal.3d at p. 49.)

The instant case is one of allegedly tortious nonfeasance to which the issue of foreseeability, as it relates to duty, is inapplicable. Liability here is not predicated upon respondent's allegedly active creation of an unreasonable risk of harm to appellant, but rather on respondent's failure to intervene for the benefit of appellant in the course of the proctored surgery.

### III

Thus, the question of law for the trial court to decide in this case was whether there was some "special relationship" between respondent and either appellant or the surgeons performing the operation, which could give rise to a duty on respondent's part to intervene in the surgery. The trial court concluded that there was no such special relationship here, and that considerations of public policy weighed heavily against imposing a duty under the undisputed facts of this case. We agree with this conclusion.

The undisputed facts show that at all times relevant herein, respondent was not appellant's physician; indeed, there was no physician-patient relationship between respondent and appellant at all. Dr. Hoek was an appointed, unpaid proctor at appellant's surgery; his only responsibility was to observe Dr. LoBianco perform surgery as part of the process of screening the latter for admission to medical staff membership at the two hospitals where surgery was performed. Such proctoring is an established procedure at hospitals throughout California, pursuant to requirements of state statute, the California Administrative Code, the Joint Commission on Accreditation of Hospitals, the California Medical Association and the California Hospital Association. (Health & Saf. Code, §§ 1250, subds. (a), (b), (f), (g), 32125, 32128; Bus. & Prof. Code, § 2282; Cal. Admin. Code, tit. 22, §§ 70701, 70703; *Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at pp. 337-347.) Proctoring plays an essential role in maintaining the professional competence of hospital medical staffs, and therefore in fulfilling the affirmative legal responsibility of hospitals to screen the competency of members of their medical staffs on a regular basis. (*Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at pp. 346-347.)

The role of the individual proctor is not to supervise; it is simply to observe and report. In this case, aside from reviewing appellant's X-rays and discussing the operative plan with Dr. LoBianco prior to each surgery,

Dr. Hoek did not take part in the care of the patient or in the operating procedures in any way; he was never requested, instructed or authorized to do so at any time, whether by the medical or administrative personnel at the hospitals in question, or by appellant herself; he did not "scrub-in" for the surgeries, but simply observed them from a position outside "the sterile field"; and he never received, requested nor expected any payment from any source for proctoring either operation. Respondent never undertook to provide any services to appellant or to the general public (*Leach* v. *Drummond Medical Group, Inc.* (1983) 144 Cal.App.3d 362, 377-378 [192 Cal.Rptr. 650]; *Coleman* v. *Middlestaff* (1957) 147 Cal.App.2d Supp. 833, 835 [305 P.2d 1020]); he never entered into any contractual relationship with appellant or the proctored physician, was not employed or requested to render any care to appellant or act as a consultant in her care, and did not volunteer to do so (*Keene* v. *Wiggins* (1977) 69 Cal.App.3d 308, 313-316 [138 Cal.Rptr. 3]; *Rainer* v. *Grossman, supra,* 31 Cal.App.3d at pp. 543-544; cf. *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at pp. 430-436; *Myers* v. *Quesenberry* (1983) 144 Cal.App.3d 888, 890-894 [193 Cal.Rptr. 733]; *Sava* v. *Fuller* (1967) 249 Cal.App.2d 281, 283, 290-293 [57 Cal.Rptr. 312]); he was not authorized to supervise or control the actions of the surgeons at appellant's operations and he had no actual control over them (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203-209 [185 Cal.Rptr. 252, 649 P.2d 894]; *Rainer* v. *Grossman, supra,* 31 Cal.App.3d at pp. 541-545); and he neither created a situation which placed appellant at risk nor affirmatively brought about any increased peril to her. (Rest.2d Torts, § 314; *Williams* v. *State of California, supra,* 34 Cal.3d at pp. 23, 27-28; *Davidson* v. *City of Westminster, supra,* 32 Cal.3d at p. 208; *Jackson* v. *Clements* (1983) 146 Cal.App.3d 983, 988 [194 Cal.Rptr. 553]; *Winkelman* v. *City of Sunnyvale, supra,* 59 Cal.App.3d at p. 512.)

In short, there was no "special relationship" between appellant and respondent that could give rise to any obligation or duty on respondent's part to take affirmative action to assist or protect appellant. (4 Witkin, Summary of Cal. Law, Torts, *supra,* § 554, at p. 2821.)

IV

Appellant argues that Dr. Hoek's proctoring of her operations "constituted a voluntary undertaking from which a duty arose." This contention is singularly without merit.

Dr. Hoek did not undertake, like a "Good Samaritan," to come to appellant's aid; neither did he otherwise give her reasonable grounds to rely on his intervention. (Rest.2d Torts, §§ 323, 324; *Williams* v. *State of Cal-*

*ifornia, supra,* 34 Cal.3d at pp. 23, 27-28; *Davidson* v. *City of Westminster, supra,* 32 Cal.3d at p. 208; *Stout* v. *City of Porterville, supra,* 148 Cal.App.3d at pp. 942-945; *Jackson* v. *Clements, supra,* 146 Cal.App.3d at pp. 987-989.) The only agreement respondent made was to proctor; that agreement was made with the hospitals themselves, and respondent never made any agreement with appellant. Although appellant insists that Dr. Hoek's agreement to proctor "renders him liable for failing to perform the duties of a proctor pursuant to the standard of care," this statement merely begs the question of what that standard is, if any, and to whom it is owed. The agreement to proctor was only an agreement to observe and report, which is precisely what respondent did. Respondent did not undertake to intervene in, supervise or control the operations; nor is there any evidence that proctoring ever involves such an undertaking.

Indeed, Dr. Hoek might well have been liable to appellant had he intervened or taken affirmative action. He was not appellant's physician; he had never treated her, examined her or even met her before; and he was not scrubbed and could not intervene without the risk of infecting appellant. An operation performed without the consent of the patient constitutes a battery. (*Berkey* v. *Anderson* (1969) 1 Cal.App.3d 790, 803 [82 Cal.Rptr. 67]; 4 Witkin, Summary of Cal. Law, Torts, *supra,* § 202, p. 2487.)

## V

Appellant attacks the rule that a person may not be liable in tort for nonfeasance absent the existence of a special relationship, urging that this rule has been discarded in the recent case of *Soldano* v. *O'Daniels* (1983) 141 Cal.App.3d 443 [190 Cal.Rptr. 310, 37 A.L.R.4th 1183]. Appellant's attempt to declare the rule dead and buried is premature, at best.

Although the *Soldano* decision found that a duty existed under the facts of that case despite the absence of any "special relationship," the case turned on the principle set forth by section 327 of the Restatement that if a person knows that a third party is ready to give aid to another and negligently prevents the third party from doing so, he is subject to liability for harm caused by the absence of the aid.[4] (*Soldano* v. *O'Daniels, supra,* 141 Cal.App.3d 443, 447, 450-453.) This distinguishes *Soldano* from the instant case, since there is no allegation that Dr. Hoek interfered with the actions of a third party who was attempting to render aid to appellant. Moreover,

---

[4]Section 327 of the Restatement Second of Torts states: "One who knows or has reason to know that a third person is giving or is ready to give another aid necessary to prevent physical harm to him, and negligently prevents or disables the third person from giving such aid, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving."

three months after the Court of Appeal decision in *Soldano,* the Supreme Court unambiguously reaffirmed the rule that "[a] person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act." (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 23.)

## VI

Appellant asserts that respondent's duty to appellant was "commensurate" with that of the hospital. We disagree.

Although a hospital clearly has a duty to its patients to review and maintain the competency of its staff members and a corresponding liability for the malpractice of a physician who is employed by or otherwise an agent of the hospital (*Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at p. 337; *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 166-168 [41 Cal.Rptr. 577, 397 P.2d 161]), no court in this or any other state has ever held that an individual proctor owes a duty of due care to the patient in a proctored surgery, much less an affirmative obligation to intervene in the operation to prevent malpractice on the part of the physicians performing the surgery. The opinion in *Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d 332, was confined to setting forth the corporate duty and liability on the part of hospitals with regard to their medical staffs. Nothing in that opinion, its rationale or sound public policy supports a conclusion that the responsibility of an individual proctor to observe, evaluate and report *to a hospital* on the competence of applicants for membership on the hospital's medical staff can be extrapolated into a direct personal liability to the patient to insure the competence of the procedure employed in a particular surgery.

Moreover, the duty imposed on hospitals by the decision in *Elam* v. *College Park Hospital* is simply to review and screen the competency of medical staff members, not to supervise them. (*Id.,* at pp. 337-347.) To the extent a proctor is an agent of the hospital—an issue we need not address—he or she would have no more duty to supervise and intervene in a proctored surgery than would the hospital itself. Like the hospital, the proctor's only duty is to observe and evaluate the competence of medical staff members in the course of the actual discharge of their professional responsibilities.

## VII

Finally, we agree with the trial court that important considerations of public policy weigh heavily against the imposition of a duty of care on

medical proctors under the circumstances presented by this case. We can perceive no moral blame in the manner in which respondent carried out his responsibilities as a proctor at appellant's operation, particularly in light of his position outside "the sterile field," the fact that there was no informed consent to his participation in the operation, and the lack of any directive or expectation that he would or should do so. With respect to the factors of prevention of future harm, the extent of the burden on potential defendants and the consequences to the community, we conclude that the extension of a general duty to patients on the part of the proctors is entirely inadvisable and unwarranted. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Brousseau* v. *Jarrett, supra,* 73 Cal.App.3d 864, 880-886 (conc. and dis. opn. of Paras, J.).)

There is a strong public interest in supporting, encouraging and protecting effective medical peer review programs and activities. "[T]he quality of in-house medical care depends heavily upon the committee members' frankness in evaluating their associates' medical skills and their objectivity in regulating staff privileges." (*Matchett* v. *Superior Court* (1974) 40 Cal.App.3d 623, 628 [115 Cal.Rptr. 317].) The fear of potential malpractice liability would not only discourage participation by medical professionals in these volunteer review committees, but would stifle candor and impair objectivity in staff evaluations.

The Legislature has made unmistakably clear its recognition of the importance of medical peer review by enacting various statutes providing protection for activities aimed at maintaining professional standards on hospital medical staffs. Thus, California Civil Code section 43.7, subdivision (b), shields the members of medical society or hospital staff committees from liability "for any act or proceeding undertaken or performed within the scope of the functions of any such committee which is formed to maintain the professional standards of the society established by its bylaws, or any member of any peer review committee whose purpose is to review the quality of medical . . . services rendered by physicians and surgeons . . . [and] podiatrists . . . which committee is composed chiefly of physicians and surgeons . . . [and] podiatrists . . . for any act or proceeding undertaken or performed in reviewing the quality of medical . . . services rendered by physicians and surgeons . . . [and] podiatrists . . . if such professional society, committee, or board member acts without malice, has made a reasonable effort to obtain the facts of the matter as to which he, she, or it acts, and acts in reasonable belief that the action taken by him, her, or it is warranted by the facts known to him, her, or it after such reasonable effort to obtain facts." As stated by the court in *Ascherman* v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623, 663 [114 Cal.Rptr. 681], in which the constitutionality of this section was upheld, "[t]he interest of the

public and the hospitals in having competent physicians and surgeons on the hospital staff is obvious. It was, therefore, proper for the Legislature to grant those charged with the investigation of the competence of applicants for membership and of existing members of a hospital staff, the qualified immunity conferred by section 43.7."

Similarly, Evidence Code section 1157 bars the discovery in legal actions of either the proceedings or the records of organized committees of hospital medical staffs "having the responsibility of evaluation and improvement of the quality of care rendered in the hospital . . . ." "Evidence Code section 1157 expresses a legislative judgment that the public interest in medical staff candor extends beyond damage immunity [established by Civil Code section 43.7] and requires a degree of confidentiality. . . . Section 1157 was enacted upon the theory that external access to peer investigations conducted by staff committees stifles candor and inhibits objectivity. It evinces a legislative judgment that the quality of in-hospital medical practice will be elevated by armoring staff inquiries with a measure of confidentiality." (*Matchett* v. *Superior Court, supra,* 40 Cal.App.3d at p. 629, fn. omitted.)[5]

We conclude that imposition on Dr. Hoek of the duty to appellant would violate the spirit and intent of these statutes, contradict the intention of the Legislature, and disserve significant public policy interests.

The judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

---

[5]As a result of this statute and the public policy behind it, the fact that a surgery is proctored and the identity of the proctor are generally not subject to discovery and therefore not known by or available to a patient at all. In this case, Dr. Hoek's identity and role in the operation were known to appellant only because Dr. LoBianco happened to mention to appellant's husband the fact that the operation would be proctored.