[No. B121946. Second Dist., Div. Seven. Apr. 28, 1999.]

ANN ARMATO, Plaintiff and Appellant, v.
SCOTT A. BADEN et al., Defendants and Respondents.

838

## COUNSEL

Ray T. McCullough for Plaintiff and Appellant.

Schmid & Voiles and Suzanne De Rosa for Defendants and Respondents Scott A. Baden and Philip H. Conwisar.

Bonne, Bridges, Mueller, O'Keefe & Nichols and Mark B. Connely for Defendants and Respondents Stephen Kay and William Brien.

## OPINION

**LILLIE, P. J.**—Plaintiff Ann Armato appeals from summary judgment granted in favor of defendants Scott A. Baden, Philip H. Conwisar, Stephen Kay and William Brien, all doctors who were working part-time as independent contractors for Managed Care Orthopedic Medical Group (Managed Care), but who did not treat plaintiff. Plaintiff was allegedly negligently

treated for a broken wrist at Managed Care by its employee physician assistant Rick DeLeon; she sued DeLeon and Managed Care and settled with them for $100,000; plaintiff then filed another action against defendants asserting the theory that even though defendants never met or treated plaintiff or supervised DeLeon's treatment of her, their conduct in allowing their names and status as doctors to be used in connection with Managed Care led plaintiff to believe that DeLeon was a medical doctor; had plaintiff known that DeLeon was only a physician assistant, she would not have let him treat her. This case presents the issue, apparently one of first impression in California, whether an independent contractor of a professional service corporation which permits his name and status to be associated with the corporation creates an "ostensible partnership" so as to make him liable for the torts of the corporation's employee.

### FACTUAL AND PROCEDURAL BACKGROUND

In September 1994, plaintiff fell and fractured her left wrist; she was initially seen at the Providence St. Joseph Hospital Emergency Room in Burbank; after her HMO (health maintenance organization), CIGNA Health Care of California, Inc. (CIGNA), would not authorize orthopedic treatment at St. Joseph, plaintiff was released and instructed by CIGNA to seek treatment from Robert Klapper, M.D., and/or Managed Care in Sherman Oaks. In 1994 and 1995, Managed Care was a medical corporation solely owned by Robert Klapper, M.D. None of the defendants were officers, directors, or employees of Managed Care; defendants worked as independent contractors for Managed Care, providing orthopedic services to Managed Care's patients assigned to them. None of the defendants have ever had an ownership or pecuniary interest in Managed Care. Defendants were paid by Managed Care a flat fee of $8,000 per month to see patients. In 1994 and 1995, Conwisar worked at Managed Care only on Monday or Friday afternoons; Baden worked only on Friday afternoons; Brien worked only on Monday mornings; and at the time Armato was treated at the Sherman Oaks office of Managed Care, Kay worked at the Burbank office and only on Thursday mornings. Brien was never licensed by the Medical Board of California to supervise physician assistants; Kay became licensed to supervise physician assistants only in March 1997.

At Managed Care, plaintiff was not seen by Dr. Klapper, but by Rick DeLeon, who, by his conduct, led plaintiff to believe he was an orthopedic surgeon; DeLeon did not correct her when she addressed him as "Dr. DeLeon." In deposition testimony, Armato admitted that she did not look at the board listing the suites in the lobby of the building where Managed Care had its offices; she recalled seeing names on the door of the Managed Care

suite, but did not recall any specific names, testifying that "I think I looked at the number and opened the door and walked in." She "didn't look" to see if the names on the door had an "M.D." after them. According to Baden, the directory in the lobby of the building listed Managed Care but the names of the individual doctors and DeLeon were not listed on such directory at the time Armato was a Managed Care patient. According to Brien, in September 1994, the door to the Managed Care suite did not contain the names of any of the defendant doctors but only the name "Managed Care Orthopedic Group."

DeLeon ordered plaintiff's arm in a cast and later prescribed physical therapy; DeLeon treated plaintiff on six occasions over a period of five months until February 16, 1995; she was seen by DeLeon only on Wednesdays and Thursdays. DeLeon did not consult with defendants about his treatment of Armato and defendants did not supervise DeLeon's treatment of Armato.

In March 1995, plaintiff sought care from her primary care physician, Dr. Doshi, because plaintiff was concerned her wrist had not healed properly; Dr. Doshi referred plaintiff to an orthopedic surgeon, a Dr. Stark, in August 1995; Dr. Stark opined that plaintiff's wrist had not healed properly because the fractures had not been set and plaintiff would require surgery to repair the damage to her wrist. Plaintiff underwent surgery, which was not successful.

In an underlying medical malpractice action filed in November 1995, plaintiff sued DeLeon as "Richard DeLeon, M.D.," Managed Care, and CIGNA. Armato and her counsel believed DeLeon was a physician until November 1996, when DeLeon's counsel disclosed to plaintiff's counsel that DeLeon was not a physician. In January 1997, the underlying action settled for $100,000 as to Managed Care, Dr. Klapper, and DeLeon.

On April 3, 1997, plaintiff filed the instant complaint against defendants. The first amended complaint asserted causes of action against defendants based on theories of battery, fraud and deceit, intentional misrepresentation, negligent misrepresentation, breach of fiduciary duty, negligent supervision, intentional infliction of emotional distress, medical malpractice and breach of contract. The first amended complaint alleged that defendants owed plaintiff a duty to supervise DeLeon's care and treatment of her, that they owed her a duty to disclose to her that DeLeon was not a physician, and that they are vicariously liable for DeLeon's actions.

On December 30, 1997, at a time when trial was set for March 9, 1998, Drs. Conwisar and Baden filed a motion for summary judgment or alternatively for summary adjudication of issues.[1] The gravamen of their motion was that they had no physician-patient or contractual relationship with Armato and owed no duty of care to her; both Conwisar and Baden declared that they did not work at Managed Care on the days when Armato was seen by DeLeon, and Managed Care did not assign Armato's care to them; prior to being served with the pending action, they had no personal knowledge that DeLeon had ever held himself out or represented himself as a physician to any Managed Care patient. Baden and Conwisar further declared that Managed Care's contract with CIGNA to see CIGNA patients was negotiated by Dr. Klapper, who alone had authority to negotiate such agreement; Baden and Conwisar never have had authority over the assignment of Managed Care's patients, and on the days when they did not work at Managed Care, they had no patient responsibility or supervisory responsibility for physician assistants at Managed Care.

In opposition to Baden and Conwisar's motion, Armato argued that all of the defendant doctors held themselves out as practicing with Managed Care, which operated as an "ostensible partnership"; thus, all physician members of the "group" are jointly and severally liable to her for DeLeon's conduct and for failing to supervise DeLeon's care of her injury. Armato also offered the deposition testimony of Dr. Klapper, who testified that the Sherman Oaks office of Managed Care was located next to Dr. Baden's office; Klapper rented the Managed Care space from Dr. Baden because "it was already an office that existed which meant it had an x-ray machine which saved us that expense." Klapper also testified that it was advantageous to him to have an office in the Valley, and that DeLeon could contact the other doctors if he needed to. Dr. Conwisar also testified that he practiced with Dr. Baden, that Managed Care's office and Dr. Baden's private practice shared a common waiting room. According to Baden's deposition testimony, the common reception room had a sign-in desk with two front desk windows or sliding glass doors separated by a pillar of drywall; there were two separate front desk receptionists, one for the practices of Baden and Conwisar and one for Managed Care; the receptionist for Baden and Conwisar had no responsibility for scheduling of Managed Care patients.

DeLeon testified that Managed Care had appointment cards with a place to note the appointment on one side, and the reverse side was stamped with

---

[1]On January 8, 1998, the court, on plaintiff's ex parte application, continued the hearing date on the motion from January 30, 1998, to February 20, 1998; the trial date of March 9, 1998, was not changed; the court also ordered that the depositions of the four defendant doctors were to be completed by January 21, 1998.

the names of Drs. Klapper, Conwisar, Baden, Kay and Brien, and his (DeLeon's) name; Managed Care's prescription pads also had the name Managed Care, along with the name of the individual physician, plus his name, title as physician assistant, and license number; however, DeLeon was not certain that the appointment cards and prescription pads were in use during the time Armato was a patient at Managed Care; there is no indication that Armato ever saw or received a Managed Care appointment card or a paper from one of its prescription pads.

On January 15, 1998, Kay and Brien filed a motion for summary judgment and/or summary adjudication based on similar facts and arguments raised by Baden and Conwisar; the hearing on the motion was set for the same date to which Baden's and Conwisar's motion had been continued—February 20, 1998. Armato filed opposition to Kay's and Brien's motion on its merits and also argued that the hearing date was untimely under Code of Civil Procedure section 437c, subdivision (a), as it was set for hearing within 30 days of trial and the prior ex parte order continuing Baden's and Conwisar's motion was solely for the purpose of permitting Armato to continue deposing witnesses in preparation for opposition to Baden's and Conwisar's motion; the continuance did not constitute a waiver of the statutory time requirements with respect to Kay and Brien.

At oral arguments on the motions, Armato argued extensively on the merits of both motions and then raised the issue of the untimeliness of the hearing date on the motion of Kay and Brien; the trial court rejected Armato's untimeliness objection, stating that "while probably late, [plaintiff] considered them. I don't see it as a major issue." The trial court then found no basis for a physician-patient relationship between Armato and the defendants and that there was no basis to hold defendants liable for the actions of DeLeon. The trial court stated that "Plaintiff has not shown any triable issues of fact to rebut defendants' evidence that an ostensible partnership was not represented to the plaintiff or that the plaintiff did not rely on [any] representation." Summary judgments were entered in favor of defendants.[2]

Plaintiff filed timely notice of appeal from the judgments. Armato's principal argument on appeal is that Managed Care "operates as an ostensible partnership and as such all physician members of 'the group' are jointly and severally liable to [her]" for the torts of Managed Care's employee DeLeon. Armato also contends that "Case precedent and public policy dictate that all the doctors should be held liable for failure to supervise [DeLeon]." Thus, we interpret Armato's briefs as raising the issues that respondents are liable based on theories of both direct and vicarious liability.

---

[2]The court entered a summary judgment in favor of Baden and Conwisar and a substantially similar summary judgment in favor of Kay and Brien.

## I

## STANDARD OF REVIEW

██ "Summary judgment is proper if the supporting papers are sufficient to sustain a judgment in favor of the moving party as a matter of law and the opposing party presents no evidence giving rise to a triable issue as to any material fact. (Code Civ. Proc., § 437c, subd. (c).) To prevail on a summary judgment motion, the defendant must conclusively negate a necessary element of the plaintiff's case or establish a complete defense. [Citation.] A defendant has met his or her burden of showing a cause of action has no merit if that party has shown one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (*Nichols* v. *Keller* (1993) 15 Cal.App.4th 1672, 1681-1682 [19 Cal.Rptr.2d 601].) "Where there is no material issue of fact to be tried and the sole question before the court is one of law, it is the duty of the trial court on a motion for summary judgment to hear and determine the issue of law. [Citation.] In reviewing a grant of summary judgment, an appellate court must make its own independent determination of the construction and effect of the papers submitted." (*Id.* at p. 1682.)

If respondents' declarations in support of the motions for summary judgment demonstrate an absence of an essential element of appellant's case, and appellant's declarations submitted in reply do not show that a triable issue of fact exists with respect to that essential element, no amount of factual conflicts upon other aspects of the case will affect the result and the motion for summary judgment should be granted. (*Clarke* v. *Hoek* (1985) 174 Cal.App.3d 208, 214 [219 Cal.Rptr. 845].)

██ "The question of the existence of a legal duty of care in a given factual situation presents a question of law which is to be determined by the courts alone. ██ Entry of summary judgment in favor of the defendant in a professional negligence action is proper where the plaintiff is unable to show the defendant owed such a duty of care." (*Nichols* v. *Keller, supra,* 15 Cal.App.4th at p. 1682.) ██ "Duty" is merely a conclusory expression used when the sum total of policy considerations lead a court to say that the particular plaintiff is entitled to protection. (*White* v. *Southern Cal. Edison Co.* (1994) 25 Cal.App.4th 442, 447 [30 Cal.Rptr.2d 431].) "Duty is an allocation of risk determined by balancing the foreseeability of the harm, in light of all of the circumstances, against the burden to be imposed. [Citation.] In determining the existence of duty, . . . 'the major [considerations] are the foreseeability of harm to the plaintiff, the degree of certainty that the

plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ibid.*) The extent to which a new duty is recognized is ultimately a question of public policy. (*Fitzpatrick* v. *Hayes* (1997) 57 Cal.App.4th 916, 920 [67 Cal.Rptr.2d 445].)

## II

### No Basis for Direct or Vicarious Liability of Respondents

■ For the moment, we set aside the issue of ostensible partnership, and address the issue of whether summary judgment was properly granted on the grounds that respondents owed no duty of care to Armato and that respondents are not vicariously liable for the alleged torts of DeLeon. The parties have not brought to our attention any California case which has addressed the issue of whether a doctor acting as an independent contractor with respect to a professional corporation is vicariously liable for the torts of an employee of the professional corporation. Moreover, no case has been brought to our attention dealing with the issue of whether a physician acting as an independent contractor with respect to a professional corporation has a duty to supervise the corporation's employees in the treatment of persons who are not patients of the physician and where the physician is not consulted specifically as to the treatment of the person.

■ " 'It is well settled that corporate directors cannot be held *vicariously* liable for the corporation's torts in which they do not participate. Their liability, if any, stems from their own tortious conduct, not from their status as directors or officers of the enterprise. [Citation.] "[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. . . . While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct." [Citations.] [¶] Directors are jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct. . . . Directors are said to be agents of their corporate principal. (Corp. Code, § 317, subd. (a).) And "[t]he true rule is, of course, that the agent is liable for his own acts, regardless of whether the principal is liable or amenable to judicial action. . . . [L]ike any other employee, directors individually owe a duty of care, independent of the corporate entity's own duty, to refrain from

acting in a manner that creates an unreasonable risk of personal injury to third parties. . . .'" (*Seagate Technology* v. *A.J. Kogyo Co.* (1990) 219 Cal.App.3d 696, 701-702 [268 Cal.Rptr. 586], citing *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 503-505 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447].) Thus, "[w]hile the doctrine of respondeat superior imposes liability on a corporation for the torts of its employees, the doctrine imposes no such liability upon the doctor, an employee of the corporation, for a tort committed by a fellow employee." (*Yaniv* v. *Taub* (1998) 683 N.Y.S.2d 35, 38.)

Accordingly, even if the foregoing principle pertaining to officers and employees of corporations applies to respondents herein, we conclude that such theory does not support liability to Armato because respondents did not personally direct or participate in the tortious conduct. For similar reasons, we conclude that there was no special relationship between respondents and Armato to support liability for failing to supervise DeLeon. "Absent a special relationship giving rise to a duty to act, a person is under no duty to take affirmative action to assist or protect another, no matter how great the danger in which the other is placed, or how easily he could be rescued." (*Clarke* v. *Hoek, supra,* 174 Cal.App.3d at p. 215.)

*Clarke* is particularly instructive in the instant case, as the Court of Appeal upheld summary judgment in favor of Hoek, a physician who was not the plaintiff's physician, but who was an appointed, unpaid proctor at the plaintiff's surgery by another physician; Hoek's only responsibility was to observe another doctor perform surgery as part of the screening process for his admission to medical staff membership at hospitals. The Court of Appeal concluded that there was no special relationship giving rise to an obligation or duty to take affirmative action to assist or protect the plaintiff: "Dr. Hoek did not take part in the care of the patient or in the operating procedures in any way; he was never requested, instructed or authorized to do so at any time, whether by the medical or administrative personnel at the hospitals in question, or by appellant herself; he did not 'scrub-in' for the surgeries, but simply observed them from a position outside 'the sterile field'; and he never received, requested nor expected any payment from any source for proctoring either operation. Respondent never undertook to provide any services to appellant or the general public [citations]; he never entered into any contractual relationship with appellant or the proctored physician, was not employed or requested to render any care to appellant or act as a consultant in her care, and did not volunteer to do so [citations]; he was not authorized to supervise or control the actions of the surgeons at appellant's operations and he had no actual control over them [citations]; and he neither created a situation which placed appellant at risk nor affirmatively brought about any increased peril to her." (174 Cal.App.3d at p. 217.)

In the instant case, we conclude that there was no special relationship warranting imposition of a duty on respondents with respect to Armato: Respondents had no physician-patient relationship with her, did not enter into any contractual relationship with Armato or with the alleged tortfeasor, DeLeon, to provide care or treatment for Armato, were not requested to render any care to her or to act as a consultant in her care, and had no actual involvement in the supervision or control of DeLeon's care rendered to her. Moreover, it is undisputed that respondents did not represent to Armato that DeLeon was a physician, and had no knowledge prior to this lawsuit that DeLeon had ever held himself out to be a physician. Nor does the fact that respondents' names may have been on the Managed Care office door or on appointment cards create any special relationship between Armato and respondents.[3]

Considerations of public policy also weigh heavily against imposing a duty under the facts of this case. It cannot be reasonably maintained that there was any moral blame in the manner in which respondents treated patients at Managed Care; nor is there any moral blame attached to the contractual relationship between Managed Care and respondents. Even assuming that respondents' names appeared on the door to Managed Care's office and on prescription pads or appointment cards, there can be no moral blame attached to such circumstances.

With respect to the factors of prevention of future harm, the burden on potential defendants, and the consequences to the community, we conclude that extension of a duty to patients under the instant circumstances is unwise and unwarranted. As courts have held in the related situation where an attending physician was not held vicariously liable for the negligence of another doctor "covering" for him: "[I]mposition of liability will discourage coverage arrangements and curtail the availability of medical service." (*Steinberg* v. *Dunseth* (1994) 259 Ill.App.3d 533 [197 Ill.Dec. 587, 631 N.E.2d 809, 813], citing *Kavanaugh* v. *Nussbaum* (1988) 71 N.Y.2d 535 [528 N.Y.S.2d 8, 523 N.E.2d 284, 289]; see also *Reed* v. *Gershweir* (1989) 160 Ariz. 203 [772 P.2d 26, 28]; *Rossi* v. *Oxley* (1998) 269 Ga. 82 [495 S.E.2d 39].) The facts of the foregoing cases are more difficult than those in the instant appeal because here there was no indication that DeLeon was "covering" for respondents with respect to Armato. If public policy considerations do not support the imposition of vicarious liability based on a

---

[3]Although there was evidence from which it could be inferred that respondents' names were not on the office door and that the appointment cards and prescription pads with all the doctors' names were not in use at the time of Armato's treatment at Managed Care, we assume for purpose of this argument that the facts were as alleged by Armato. Even if the facts were as alleged by Armato, we conclude there was no special relationship sufficient for imposition of a duty on respondents.

covering physician's negligence, those same considerations do not support vicarious liability here. For similar reasons, we conclude that imposition of liability in the instant case would only increase malpractice insurance premiums and discourage doctors from making arrangements for the continuous care of their patients. For all of the foregoing reasons, we conclude that the public interest would be disserved by imposition of liability in this case.

We thus conclude that there is no basis to impose liability on respondents herein for their own conduct or based on a theory of vicarious liability for the actions of DeLeon. We turn now to the theory of ostensible partnership.

## III

### No Basis for Ostensible Partnership[4]

Appellant contends that Corporations Code former sections 15014 and 15015 (see now Corp. Code, §§ 16305 and 16306) support the imposition of liability against respondents under an "ostensible partnership" theory.[5] However, those sections do not deal with the issue of ostensible partnership or purported partners, and provide no support for appellant's contentions herein. Respondents point out that Corporations Code former section 15016, pertaining to partners by estoppel (see now Corp. Code, § 16308, using the term "purported partner"), deals with the issue of partners by estoppel; however, the statutory requirements therein are not met in this case. Appellant expressly denies that she is relying upon Corporations Code former

---

[4]"Many courts use the terms ostensible agency, apparent agency, apparent authority, and agency by estoppel interchangeably. As a practical matter, there is no distinction among them." (*Baptist Memorial Hosp. System* v. *Sampson* (Tex. 1998) 969 S.W.2d 945, 948, fn. 2.) On this appeal, we also deem to be essentially interchangeable the terms ostensible partnership, apparent partnership, purported partnership, and partnership by estoppel.

[5]Corporations Code former section 15014 provided: "The partnership is bound to make good the loss: [¶] (a) Where one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it; and [¶] (b) Where the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership."

Corporations Code former section 15015 provided in pertinent part: "(a) Except as provided in subdivision (b), all partners are liable as follows: [¶] (1) Jointly and severally for everything chargeable to the partnership under Sections 15013 and 15014. [¶] (2) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract."

The remaining subdivisions of former section 15015 dealt with registered limited liability partnerships, and did not deal with the liability of purported partners or the concept of ostensible partnership, so we do not set out those subdivisions here.

section 15016 in her reply brief, apparently in an attempt to evade the statutory requirements for liability set out therein.[6]

■ With respect to the predecessor statute to Corporations Code former section 15016, the court stated in *Moen* v. *Art's Cafe* (1950) 95 Cal.App.2d 577, 579 [213 P.2d 393]: "The rule of responsibility and liability declared in this section of the Civil Code is founded upon the doctrine of equitable estoppel. [Citation.]" "The question to be answered when it is contended that a defendant is an ostensible partner is whether the acts and conduct of an individual were factually and legally sufficient to lead another person to believe he was a copartner and assumed responsibility for such." (*J. C. Wattenbarger & Sons* v. *Sanders* (1963) 216 Cal.App.2d 495, 500-501 [30 Cal.Rptr. 910].) The representations or acts need not be actuated by the actual intent to deceive; it is sufficient if the course of conduct is such as to induce a reasonable and prudent person to believe that which the conduct would imply. (*Crabbe* v. *Mires* (1952) 112 Cal.App.2d 456, 459 [246 P.2d 991].)

■ Assuming without deciding that Corporations Code former section 15016 applies in this case, we agree with respondents that the statute would not support the imposition of liability against respondents because respondents did not represent themselves, or consent to another representing them, as partners "in an existing partnership," or as a partner "with one or more persons not actual partners." Moreover, there is insufficient evidence that Armato relied upon any alleged representation or gave credit to the apparent partnership. The only purported representations in this case arise out of the facts that respondents may have permitted their names to be listed on the door to the Managed Care office, and perhaps on appointment cards and prescription pads. (See fn. 3, *ante*.) Baden also apparently shared a waiting room with Managed Care, but had a separate receptionist.

The listing of respondents' names in connection with the Managed Care office is insufficient as a matter of law to establish any agency or ostensible partnership between any respondent and Managed Care or DeLeon. Generally, the law indulges in no presumption than an agency exists but instead

---

[6]Corporations Code former section 15016 provided in pertinent part: "(1) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership . . . . [¶] . . . [¶] (2) When a person has been thus represented to be a partner in an existing partnership, or with one or more persons not actual partners, he is an agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, with respect to persons who rely upon the representation. . . ."

presumes that a person is acting for himself and not as agent for another. (*Inglewood Teachers Assn.* v. *Public Employment Relations Bd.* (1991) 227 Cal.App.3d 767, 780 [278 Cal.Rptr. 228].) Moreover, it was held in *J. C. Wattenbarger & Sons* v. *Sanders, supra,* 216 Cal.App.2d 495, that a limited partner defendant was not an ostensible general partner merely because the fictitious partnership certificate listed his name without a designation that he was a limited partner. (*Id.* at p. 501.) Thus, the mere listing of respondents' names in the places and in the manner alleged by appellant does not reasonably induce a belief that respondents and DeLeon, or respondents and Managed Care, were copartners. Moreover, the fact that Baden and Conwisar had a separate receptionist implies that they are operating independently of Managed Care; this factor alone, or in combination with the other alleged representations, does not reasonably support an inference of partnership by estoppel. Accordingly, we conclude that there were no express or implied representations by respondents that could give rise to liability under an ostensible partnership theory.

Appellant's reliance on *Redman* v. *Walters* (1979) 88 Cal.App.3d 448 [152 Cal.Rptr. 42] is misplaced as the case is factually distinguishable and offers no language which is helpful in resolving the issues herein. *Redman* was summarized as follows in *Beane* v. *Paulsen* (1993) 21 Cal.App.4th 89, 97 [26 Cal.Rptr.2d 486]: "In *Redman,* the plaintiff engaged the services of a [law] partnership in 1969. In 1970, defendant Walters left the firm, never having met the plaintiff or participated in his lawsuit. There was no communication with the plaintiff about the defendant's separation from the partnership, other than a change in the letterheads in correspondence sent to him or the headings of pleadings. In 1974, the plaintiff's action was dismissed for failure to prosecute, at which point he brought suit against the partnership and defendant Walters. [Citation.] In reinstating the plaintiff's action as to defendant Walters, the *Redman* court first noted the principle of partnership law that in dissolution, the partnership 'continues' as to contractual obligations until they are satisfied. [Citation.] Thus, having been a member of a partnership that contracted with the plaintiff, the defendant continued to be a partner for purposes of that contract until it was discharged, and as a partner he would have vicarious liability for the negligent acts of his partners in performing the contract. . . ."

Finally, appellant's challenge to the timeliness of the hearing on the motion of Kay and Brien under Code of Civil Procedure section 437c, subdivision (a), is without merit. The trial court impliedly, if not expressly, concluded that good cause existed for hearing the motion within 30 days of the date of trial under subdivision (a) of section 437c; appellant fails to establish that the implied finding of good cause constituted an abuse of discretion.

## DISPOSITION

The judgments are affirmed. Respondents are entitled to costs on appeal.

Woods, J., and Neal, J., concurred.