**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP Nos.  NC-17-1015-STaB |
| ) | NC-17-1034-STaB |
| LEONG PARTNERSHIP, ) | (related appeals) |
| ) | |
| Debtor. ) | Bk. No.  4:16-bk-42363 |
| _____ ) | |
| WARREN HAVENS, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **MEMORANDUM**[*] |
| ) | |
| ARNOLD LEONG; UNITED STATES ) | |
| TRUSTEE, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Submitted Without Oral Argument
on February 16, 2018

Filed – March 23, 2018

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Charles D. Novack, Bankruptcy Judge, Presiding

Appearances:    Appellant Warren Havens, pro se, on brief; Jeremy V. Richards and Miriam Manning of Pachulski Stang Ziehl & Jones LLP on brief for appellee Arnold Leong.

Before: SPRAKER, TAYLOR and BRAND, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Warren Havens appeals from the bankruptcy court's summary judgment dismissing the involuntary chapter 11[1] petition he filed against alleged debtor Leong Partnership. Havens argues that Arnold Leong, one of three general partners Havens listed on the involuntary petition, lacked standing to oppose the involuntary bankruptcy. Havens further argues that the evidence he submitted in opposition to Leong's summary judgment motion was sufficient to justify its denial. Because we disagree with Havens on both counts, we AFFIRM.

**FACTS**

For more than fifteen years, Havens and Leong have litigated over their respective interests in roughly 5500 radio licenses issued by the Federal Communications Commission ("FCC") and the entities holding those licenses. One of these entities was Telesaurus - VPC, LLC, a Delaware limited liability company.[2] Havens and Leong entered into a written agreement that formed Telesaurus, gave Havens the majority interest, and gave Leong the remaining minority interest. Leong later claimed that he and Havens had entered into a separate, oral agreement that required Havens to equalize ownership of Telesaurus and the licenses.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] We have seen a variety of spellings of this company's name. We have adhered to the one used by Leong in his state court complaint.

Havens, for years, has repeatedly and consistently denied the existence of this oral agreement.

**A. The State Court Litigation Involving Leong and Havens.**

As a result of the Telesaurus dispute, in 2002 Leong filed a lawsuit in the Alameda County Superior Court against Havens and others (the, "Leong Action"). The Leong Action now includes as defendants Telesaurus and seven additional Havens-controlled companies that currently hold the disputed FCC licenses and additional, subsequently-purchased FCC licenses. The parties refer to these license holding entities as the pPNT companies.[3] Havens is the founder and majority interest holder of the pPNT companies.[4]

In 2005, the Alameda Superior Court ordered Leong and Havens to arbitrate. Ten years later, the arbitration still was pending, and Leong moved for appointment of a receiver in the Leong Action. In November 2015, the Alameda Superior Court appointed Susan Uecker to serve as the receiver of the pPNT companies and to take control from Havens of the companies' assets, including the FCC licenses. The Alameda Superior Court appointed a receiver in large part because of Havens' recalcitrant conduct in proceedings before the FCC. This conduct is described in an April 2015 FCC administrative law judge's order calling into question Havens' qualifications to hold the FCC licenses, which in turn placed the the licenses at risk of

[3] The term "pPNT" refers to precise Position, Navigation and Timing.

[4] Havens is the sole member of one of the pPNT companies, the Skybridge Spectrum Foundation.

extinguishment.

Many of Havens' actions since November 2015 have been aimed at resisting Uecker's receivership efforts. For example, Havens filed both a motion to terminate the receivership and a notice of appeal from the receivership order in the Leong Action. Havens also commenced a voluntary bankruptcy case in Delaware on behalf of one of the pPNT companies, Skybridge Spectrum Foundation. The Delaware bankruptcy court dismissed that case, finding that it was filed in violation of the Alameda Superior Court's receivership order.

**B. The Involuntary Petition Filing Against the Leong Partnership.**

Shortly after the Delaware bankruptcy court dismissed the Skybridge bankruptcy case, Havens filed an involuntary chapter 11 petition against an entity called the Leong Partnership. The involuntary petition was based on the premise that, by way of the receivership, Leong and his "partners," effectively sought to, and did, take control of the pPNT Companies and their FCC license assets. Havens stated that he filed the involuntary petition to address and remediate the deleterious effects of the receivership and take control back from this alleged partnership.

**1. The Alleged Partners of the Leong Partnership.**

In the petition, Havens identified the partners in the Leong Partnership as Leong and two other individuals with similarly lengthy litigation histories with Havens: Mark Griffith and Channing Jones. In 2012, Mark Griffith filed a separate lawsuit against Havens, also in Alameda Superior Court, to recover compensation from Havens and the pPNT companies. There is an email string reflecting that, in December 2013 and January 2014,

4

Griffiths and Leong attempted to coordinate some of their litigation efforts against Havens. However, shortly thereafter, Griffith entered into a settlement agreement with Havens that supposedly fully resolved their dispute. The settlement included a broad release of Griffith's claims against Havens. Havens contends that Griffith breached the settlement agreement by, among other things, not producing certain documents relating to Havens' dispute with Leong. On May 13, 2015, Havens and the pPNT companies sued Griffith, asserting various breach of contract and tort claims related to the alleged breach of that settlement agreement.

Channing Jones also sued Havens regarding investments he made in Havens-controlled companies. Jones, in addition, initiated arbitration proceedings against Havens based on the $1.3 million in funds he invested to enable Havens to purchase FCC licenses. According to Jones, at least a portion of these funds were used to purchase licenses that ended up as assets of the pPNT Companies.

In his arbitration proceeding, commenced in 2012, Jones advocated for the consolidation of his arbitration with the Leong arbitration. In a letter dated March 9, 2012, to the arbitrator in support of consolidation of his arbitration with Leong's arbitration, Jones claimed that his transactions with Havens were "closely related . . . both factually and legally to Leong's transactions with Havens." The letter describes Jones' relationship with Havens to be "like Mr. Leong, ... a long-time co-venturer with Mr. Havens." As one example of this interrelationship, Jones asserted that, in 1990, he and Leong

5

were both "partners" of Havens in a venture called SunCom Communications. Notably though, SunCom Communications is not one of the pPNT Companies, and was not a named party in any of Leong's litigation with Havens.

Again relying on the March 2012 letter, Havens points out that Jones described both his and Leong's entitlement to ownership interests in the pPNT Companies as "interlocking." However, a closer inspection reveals that Jones' reference to interlocking interests simply meant that both he and Leong claimed ownership interests in some of the pPNT Companies. Jones maintained that it would be difficult to untangle those interests because Havens had created a maze of entities and transactions to intentionally obfuscate the ownership entitlements of his investors.

Similar to Griffith, Jones settled his litigation against Havens by no later than December 2013, as reflected by Jones' voluntary dismissal with prejudice of his state court lawsuit against Havens, well before the Alameda Superior Court appointed the receiver in the Leong Action.

**2.    The Petitioning Creditors and the Claims Asserted against the Leong Partnership.**

The involuntary petition was signed by Havens and two related creditors. Havens asserted two different types of claims against the Leong Partnership: a salary and rent claim in an amount exceeding $460,000, and an unspecified tort claim in an amount exceeding $100 million. Havens maintained that some of the pPNT Companies owed him for salary and rent, but he did not explain how the so-called Leong Partnership became liable for

6

obligations incurred by different entities (that Havens had controlled). He only stated that this liability flowed to the Leong Partnership because it assumed de facto ownership and control of the pPNT Companies when the receiver was appointed. With respect to the $100 million tort claim, Havens indicated that the claim arose from the value of his equity and control interests in the pPNT Companies, which interests he asserts the Leong Partnership now possesses, de facto, as a result of the appointment of the receiver.

One of the other two petitioning creditors was Polaris PNT PBC, a Delaware Public Benefit Corporation formed in July 2016, which Havens controls. Polaris' alleged claim against the Leong Partnership resulted from Havens' assignment of $100,000 of his personal claims to Polaris.[5]

The third petitioning creditor was Skybridge Spectrum Foundation, the pPNT entity that Havens had placed into bankruptcy in Delaware. Skybridge's claims against the Leong Partnership were also the result of Havens' assignment of his personal claims. Havens later withdrew Skybridge as a petitioning creditor, presumably because the injunctive relief contained in the receivership order prohibited Havens from acting on behalf of Skybridge.[6]

_____

[5] Because of the derivative nature of Polaris' claim against Leong, for ease of reference, all future references herein to Havens' claim also are meant to refer to Polaris' claim.

[6] The withdrawal of Skybridge calls into question the sufficiency of the involuntary petition as three creditors are required to commence an involuntary petition unless there are
(continued...)

7

**C. The Motion for Summary Judgment.**

After an unsuccessful attempt to obtain dismissal of the involuntary petition, Leong filed a summary judgment motion. To support his summary judgment motion, Leong relied on the restriction in § 303(b) limiting the filing of involuntary petitions to only those creditors whose claims are "not . . . the subject of a bona fide dispute as to liability or amount." Leong asserted that the claims of the petitioning creditors were the subject of bona fide dispute for a number of reasons. First, there was little or no evidence that the Leong Partnership actually existed. Second, there was no evidence that the Leong Partnership had incurred any salary or rent obligations, which actually were disputed liabilities allegedly owed by some of the pPNT Companies that Havens had controlled. Leong pointed out that the documents on which Havens relied to support the existence of the salary and rent claim identified some of the pPNT Companies as the obligors and not the Leong Partnership.

Similarly, Leong noted that Havens' $100 million tort claim supposedly was based on the Leong Partnership's alleged "de facto" control of the pPNT Companies. Leong argued that Havens could only demonstrate that Leong had been successful in convincing the Alameda Superior Court to appoint a receiver in the Leong Action. The stated purpose of the receivership is to preserve the value of the FCC license assets of the pPNT

[6](...continued)
fewer than 12 qualifying creditors. §§ 303(b)(1) and (2). However, the parties have not addressed this issue on appeal. We need not address the issue as it would not affect the disposition of the case.

8

companies and not to transfer control to Leong (or anyone else).

To support his summary judgment motion, Leong submitted many of the same documents Havens had referenced in and relied upon in his attachments to the involuntary petition, but Leong posited much different explanations regarding the significance and meaning of these documents. Leong contended that the documents evidenced nothing more than a hotly-contested dispute over the respective ownership and control interests in the FCC licenses and the pPNT Companies. Both Leong and Griffith submitted declarations in which they denied the existence of the Leong Partnership or having heard of any such entity until after Havens filed the involuntary petition. Both Leong and Griffith further maintained that they never acted in any concerted fashion that could have resulted in the formation of a partnership, either express or implied.

Though Havens filed the involuntary petition in pro per, he retained counsel to file an opposition to the summary judgment motion. Havens insisted that additional time for discovery was necessary to "confirm the existence of the 'Leong Partnership'" and to obtain evidence "directly relevant to the validity of the Petitioning Creditors' claims." Opposition to Motion for Summary Judgment (Dec. 2, 2016) at 4:5-6, 4:11.

Havens contended that, based on the admissible evidence, the bankruptcy court could not possibly conclude either that the Leong Partnership did not exist or that his claims were invalid. Havens further contended that the conduct of Leong, Jones and Griffith established an "actual partnership" or a "partnership by estoppel." Yet, Havens provided no legal authority to support

9

these arguments. Rather, he asserted that the Leong Partnership's liability for his claims flowed from the appointment of the receiver and the effective control the receivership gave Leong over the pPNT Companies. In addition, in his supplemental declaration, he maintained that, under tax law, the type of control that the Leong Partnership allegedly obtained could result in pass-through tax liability.

At the hearing on the summary judgment motion, the court heard the parties' oral argument and took the matter under submission. The court also ruled on Havens' evidentiary objections, overruling most of them.

The bankruptcy court entered its order granting the motion for summary judgment on December 29, 2016. In the order, the bankruptcy court gave a detailed recitation of the uncontroverted facts in the record and carefully analyzed why, in light of those facts, Leong was entitled to summary judgment. In essence, the court held that none of the statements Havens relied upon necessarily suggested any recent concerted effort by Leong, Jones and Griffith against Havens.

As for Havens' claims, the bankruptcy court determined based on the uncontroverted facts that both claims were subject to bona fide dispute. The bankruptcy court particularly was concerned regarding Havens' assertion that the Leong Partnership was liable for Havens' $468,000 salary and rent claim because of its de facto control over the pPNT Companies. As the bankruptcy court noted, there was no evidence of such de facto control. To the contrary, it was uncontroverted that the state court receiver was in control of the pPNT Companies. Furthermore, Havens failed

10

to present any viable legal theory how the Leong Partnership's alleged control would cause the liability for the salary and rent claim to flow from the pPNT Companies to the Leong Partnership.

The bankruptcy court further held that Havens' unliquidated $100 million tort claim suffered from the same types of defects. Like the salary and rent claim, the tort claim was founded on the unsupported allegation that the Leong Partnership had taken over de facto control of the pPNT Companies. Additionally, Havens' summary judgment opposition papers were bereft of any legal explanation as to what type of tort could have arisen from the alleged de facto control.

The court entered summary judgment dismissing the involuntary petition on January 18, 2017. Havens timely appealed the order granting the motion for summary judgment (NC-17-1015) and the summary judgment of dismissal (NC-17-1034).[7]

### JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). See Marciano v. Fahs (In re Marciano), 459 B.R. 27, 34 (9th Cir. BAP 2011), aff'd, 708 F.3d 1123 (9th Cir. 2013). We have jurisdiction under 28 U.S.C. § 158.

---

[7] Several months after the bankruptcy court entered its summary judgment of dismissal, the bankruptcy granted Leong's motion to recover attorneys' fees and costs under § 303(i) and entered judgment against Havens and Polaris, jointly and severally, for $262,070.50 in fees and $562.60 in costs. Havens timely appealed the fee order, but the fee order appeal is not before this Panel; Havens elected to have his fee order appeal heard by the United States District Court for the Northern District of California.

## ISSUES

1.  Did Leong have standing to oppose the involuntary petition?

2.  Did the bankruptcy court err when it entered summary judgment dismissing the involuntary petition?

## STANDARDS OF REVIEW

We review summary judgment rulings de novo. See In re Marciano, 459 B.R. at 35. Whether the Code permitted Leong, a named general partner of the debtor, to oppose the involuntary petition is a question of standing, which we also review de novo. Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal), 450 B.R. 897, 906 (9th Cir. BAP 2011).

We can affirm on any ground supported by the record. Campidoglio LLC v. Wells Fargo & Co., 870 F.3d 963, 973 (9th Cir. 2017).

## DISCUSSION

**A.   Leong's Standing to Challenge the Involuntary Petition.**

Before we consider whether Leong met his summary judgment burden, there is a threshold question we must address: whether Leong had standing to oppose the involuntary petition. See Warth v. Seldin, 422 U.S. 490, 498 (1975) (holding that Article III standing is a "threshold issue in every federal case, determining the power of the court to entertain the suit."). Here, there is no real question that Leong met the relatively minimal requirements of constitutional standing, which include injury in fact, causation, and redressability. In re Veal, 450 B.R. at 906. With respect to injury in fact and causation, it is beyond cavil that the filing of an involuntary bankruptcy petition against a partnership directly and significantly impacts

12

those alleged to be general partners of that partnership. That is why alleged partners historically have been permitted to oppose such petitions. See Advisory Committee Note accompanying Rule 1011 (noting possible consequences to alleged general partners and citing cases); Kennedy, Partnerships and Partners Under the Bankruptcy Reform Act and the New (Proposed) Rules, 27 St. Louis U.L.J. 507, 553-55 & n.239 (1983). As for redressability, successfully opposing the involuntary petition would remedy the potential impact of the petition by preventing the entry of the order for relief.

Havens has not seriously challenged Leong's constitutional standing. Instead, Havens construes Rule 1011(a) as excluding alleged partners from standing to contest an involuntary petition against a partnership.[8] Rule 1011(a) specifically permits alleged partners to oppose an involuntary petition against a partnership, but the reference within that rule is directed towards involuntary petitions filed against a partnership under Rule 1004.[9] Havens argues that this is problematic because Rule

_____

[8] Havens first raised his Rule-based standing argument in a motion he filed in the bankruptcy court requesting entry of the order for relief. Havens maintained that, because Leong lacked standing, the involuntary petition against the Leong Partnership effectively was unopposed, so an order for relief should have been immediately entered under § 303(h). Havens' standing argument appears to be derived from the concept of statutory standing. Statutory standing is a prudential, nonjurisdictional variant of the standing doctrine. In re Godon, Inc., 275 B.R. 555, 564 (Bankr. E.D. Cal. 2002).

[9] Rule 1011(a) provides:

**(a) Who may contest petition**

(continued...)

13

1004, which governs involuntary petitions against partnerships, references only § 303(b)(3), the statutory provision governing involuntary petitions against partnerships filed by fewer than all of the partners of that partnership.[10]  Havens points out that he filed his involuntary petition under § 303(b)(2) as an alleged creditor of the Leong Partnership.  Neither Rule 1011(a), nor Rule 1004, specifically address who may defend an involuntary petition filed against a partnership by creditors under § 303(b)(2).

Havens argues that the reference in Rule 1011(a) to alleged partners applies only in those involuntary bankruptcy cases commenced by the partnership itself.  As a consequence of Rules 1011(a) and 1004, he argues that an alleged partner lacks standing to contest an involuntary petition commenced by creditors.  Havens' restrictive reading of Rule 1011(a)

---

[9](...continued)
The debtor named in an involuntary petition may contest the petition.  In the case of a petition against a partnership under Rule 1004, a nonpetitioning general partner, or a person who is alleged to be a general partner but denies the allegation, may contest the petition.

[10] Rule 1004 specifically applies to involuntary petitions but references only those petitions filed under § 303(b)(3) by a petitioning partner:

After filing of an involuntary petition under § 303(b)(3) of the Code, (1) the petitioning partners or other petitioners shall promptly send to or serve on each general partner who is not a petitioner a copy of the petition; and (2) the clerk shall promptly issue a summons for service on each general partner who is not a petitioner.  Rule 1010 applies to the form and service of the summons.

14

completely ignores § 303(d), which provides:

> (d) The debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to a petition under this section.

Havens identified Leong as a general partner of the Leong Partnership. Pursuant to Rule 1004, Havens obtained and served summonses upon each of the general partners, including Leong. Having been named by the petitioning creditors as a general partner in the involuntary petition and issued a summons, Leong clearly had standing to defend against the petition under § 303(d).[11] That his defense to the involuntary petition included denial of the partnership is irrelevant to his standing to assert that defense given the petition. To hold otherwise would be to deny Leong due process.[12] To the extent that his

---

[11] Under prior law, individuals alleged to be partners were permitted to oppose the involuntary petition against the partnership even if they denied the allegation that they were partners and regardless of whether the involuntary petition was filed by creditors or by another partner. See Former Bankruptcy Rule 112; Kennedy, supra, at 554 & n.239. In short, when Congress enacted § 303(d), it was not writing on a clean slate. As a rule of statutory construction, we typically presume that Congress did not intend to change existing pre-Code bankruptcy practice unless the Code or the legislative history makes that intent to change clear. Dewsnup v. Timm, 502 U.S. 410, 419 (1992); Kelly v. Robinson, 479 U.S. 36, 47 (1986).

[12] The Fifth Amendment provides: "No person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976). If we were to interpret § 303(d) to exclude Leong because he challenges the underlying partnership we would effectively foreclose any challenge to the involuntary petition. Under the doctrine of constitutional avoidance, when faced with two competing plausible interpretations of a statute, we

(continued...)

15

standing conflicts with Rule 1011(a), which we believe it does not, it is well established that "any conflict between the Bankruptcy Code and the Bankruptcy Rules must be settled in favor of the Code." Am. Law Ctr. PC v. Stanley (In re Jastrem), 253 F.3d 438, 441–42 (9th Cir. 2001).

**B.    The Bankruptcy Court's Summary Judgment Ruling.**

Having concluded that Leong had standing, we review the bankruptcy court's summary judgment dismissing the involuntary petition.  Under § 303(b)(1) and (2), only certain creditors may file an involuntary petition against an alleged debtor.  To be qualified to file the involuntary petition, the creditors must, among other things, hold a claim that is not subject to bona fide dispute.  Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.), 277 F.3d 1057, 1064 (9th Cir. 2001). More specifically, the statute provides that the claims of each petitioning creditor must be neither contingent as to liability nor subject to "bona fide dispute as to liability or amount." § 303(b)(1).

Whether a bona fide dispute exists is a question of fact, and "[t]he burden is on the petitioning creditors to show that no bona fide dispute exists."  In re Vortex Fishing Sys., Inc., 277 F.3d at 1064 (citing Rubin V. Belo Broad. Corp. (In re Rubin), 769 F.2d 611, 615 (9th Cir. 1985)).  A claim is subject to "bona fide dispute" if "there is an objective basis for either

---

[12](...continued)
generally must presume that Congress did not intend the interpretation that would raise serious constitutional doubts. Clark v. Martinez, 543 U.S. 371, 380–82 (2005).

16

a factual or a legal dispute as to the validity of the debt." Id. (citation omitted). Put another way, "if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed." Id. (citation omitted).

Summary judgment required Leong to establish that there was no genuine dispute that Havens' claims were disputed.[13] For summary judgment purposes, an issue is genuine only if the trier of fact could find in favor of the non-moving party. Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir. 2001). Thus, Leong was entitled to summary judgment if no reasonable trier of fact could have found, on the record presented, that Havens' claims were beyond bona fide dispute. When, as here, the non-moving party would bear the burden of proof at trial to establish an essential element of his or her case, the moving party can meet his or her summary judgment burden by pointing to the absence of evidence to support an essential element of the non-moving party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).

Havens' contention that the Leong Partnership took control of the pPNT companies and thereby assumed liability for Havens' rent and salary claim against the pPNT companies was not

_____

[13] Applying the standard for summary judgment is somewhat confusing in this contest: Leong was required to prove that there was no genuine dispute that Haven's claims were subject to a bona fide dispute, which required evidence that there was a genuine issue of material fact as to the partnership's liability or damages.

17

supported by any evidence or any concrete legal theory. Indeed, it is contradicted by the state court receivership. There is simply nothing to support the contention that the Leong Partnership owed Havens rent and salary. While Havens argues that the bankruptcy court erroneously determined that the Leong Partnership did not owe him rent and salary, he misstates the question. The bankruptcy court did not decide that there were no claims against the Leong Partnership for rent or salary, only that there was no genuine dispute that such claims were the subject of a bona fide dispute and could not support the involuntary petition. The record amply supports this determination.

The same is true regarding Havens' tort claims, which remain unliquidated. This alone precluded Havens from using them to support an involuntary petition. Moreover, Havens failed to identify the specific conduct qualifying as tortious or the particular types of torts that allegedly occurred.

Given the absence of any evidence to suggest that the Leong Partnership was liable to Havens for rent and salary, or for any tort, the bankruptcy court correctly ruled that Havens failed to establish a genuine issue that his claims were beyond bona fide dispute. See Celotex Corp., 477 U.S. at 323-25. Havens contends that the bankruptcy court ignored his evidence, incorrectly determined that his claims were invalid, and improperly relinquished its jurisdiction in favor of proceedings in the Alameda Superior Court. Havens' arguments betray a fundamental misunderstanding of the controlling issue concerning the existence of a bona fide dispute. The bankruptcy court granted

18

summary judgment because Leong was able to point to viable factual and legal issues calling into question the validity and existence of Havens' claims. This negated an element essential to Havens' involuntary petition: the absence of a bona fide dispute as to the claims of the petitioning creditors. Consequently, all of the above-referenced arguments, which Havens characterizes as demonstrating reversible error, actually demonstrate no error at all.

**C.    Existence of the Leong Partnership**.

The parties and the bankruptcy court invested much time and effort addressing the existence of the Leong Partnership. Because Havens' claims were subject to bona fide dispute, our analysis of the existence of the partnership is not essential to our resolution of this appeal. Even so, we note our agreement with the bankruptcy court's assessment of the partnership issue. The litigant statements that Havens relied upon to fashion the existence of the Leong Partnership were, themselves, equivocal at best. But, this is exactly the point; the very equivocal nature of the evidence Havens presented demonstrated the existence of a bona fide dispute as to the existence of the partnership and, by extension, the existence of any claims against such entity.

Havens claims that the bankruptcy court used too narrow a definition of partnership and only considered the absence of a formal written partnership agreement. We disagree. The bankruptcy court acknowledged that a partnership can arise solely from the conduct of the parties. Conduct that would lead a reasonable person to believe that a partnership has been formed is a foundational requirement for both of Havens' alternate

19

partnership theories – actual partnership and partnership by estoppel.  See In re Lona, 393 B.R. 1, 14-17 (Bankr. N.D. Cal. 2008) (summarizing and applying Cal. partnership law).[14]

Here, the paucity of evidence of conduct that reasonably could have led a third party to believe that the Leong Partnership had been formed afforded Leong with an objective factual basis for disputing the existence of the Leong Partnership.  This, in turn, was sufficient to support the bankruptcy court's determination that the existence of the Leong Partnership was subject to bona fide dispute.[15]

**D.    Havens' Other Arguments.**

Havens makes three additional arguments on appeal that

---

[14] In the bankruptcy court, Havens argued that Delaware law should be used to determine the partnership issue.  The bankruptcy court disagreed and instead applied California law given that two of the three alleged general partners resided in California and the events allegedly leading to the supposed formation of the Leong Partnership mostly occurred in California.  Havens has not challenged on appeal the bankruptcy court's choice of law determination, so we also have applied California partnership law.

[15] Under the doctrine of ostensible partnership or partnership by estoppel, an individual can be estoped from denying that they are a partner of a partnership if, by their words or conduct, they held themselves out to be a partner of that partnership or consented to being represented as such by others.  See Cal. Corp. Code § 16308(a); Armato v. Baden, 71 Cal. App. 4th 885, 898 (1999).  The statute and case law indicate that this doctrine is a means of imposing partnership liability on one or more persons when a formal partnership might not, in fact, have existed.  See J & J Builders Supply v. Caffin, 248 Cal. App. 2d 292, 297-98 (1967).  It is far from clear that this doctrine is sufficient to support the existence of a partnership for purposes of filing an involuntary partnership petition under the Code.  In light of our resolution of this appeal, we do not need to reach this issue.

20

perhaps exist independently of the controlling bona fide dispute question. Havens, first, argues that the bankruptcy court should have dismissed the involuntary petition pursuant to § 303(j)(1) based on a notice of voluntary dismissal he filed in December 2014, shortly before the bankruptcy court entered its order granting Leong's motion for summary judgment. Section 303(j) sets forth the requirements for obtaining a voluntary dismissal of an involuntary petition. Because Havens' notice of voluntary dismissal patently contravened § 303(j)'s requirements, the bankruptcy court's refusal to dismiss the petition under § 303(j) was not reversible error. See generally 2-303 Collier on Bankruptcy ¶ 303.34 (16th ed. 2017).

Havens next argues that the bankruptcy court committed reversible error when it erroneously commented in its post-judgment order granting Leong's § 303(i) fee motion that Jones specifically denied the existence of the Leong Partnership. While Leong and Griffith submitted declarations denying the existence of the partnership, Jones did not. The bankruptcy court's apparent mistake regarding the Jones denial was part of an order entered several months after entry of the summary judgment dismissing the involuntary petition. As such, it is not entitled to any bearing in our review of the summary judgment ruling. See Castro v. Terhune, 712 F.3d 1304, 1316 n.5 (9th Cir. 2013). The fee appeal is not before the Panel; furthermore, there is no indication in the record that the bankruptcy court was suffering from a similar misapprehension at the time it entered summary judgment or that such a misapprehension, if it existed at that time, would have materially altered the

21

bankruptcy court's bona fide dispute determination. Indeed, such statement has no bearing on the bona fide dispute of the underlying claims themselves.

Havens' third argument concerns the denial of his request that the summary judgment motion be continued or denied so that he could have a lengthier opportunity to conduct further discovery. Nothing in Havens' opposition papers explained: (1) what specific facts he expected to obtain through further discovery; (2) how those facts would have helped him establish a genuine issue of material fact regarding the bona fide dispute issue; or (3) why he was unable to obtain the same information during the years of litigation between him and Leong preceding the filing of the involuntary petition. Without such explanations, Havens was not entitled to a continuance or denial of the summary judgment motion. See Moss v. U.S. Secret Serv., 572 F.3d 962, 966 n.3 (9th Cir. 2009); see also 14-C Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial ¶ 14:114 (listing and explaining full requirements for obtaining postponement or denial of a summary judgment motion based on alleged need for further discovery).[16]

_____

[16] It is unclear whether Havens meant to challenge on appeal the bankruptcy court's overruling of his evidentiary objections to the declarations of Leong and Griffith. Havens has not brought to our attention any particular error in the bankruptcy court's evidentiary rulings. Even if there were such error, it could not have prejudiced Havens' rights. On this record, we are convinced that the evidentiary rulings did not affect the outcome of the summary judgment motion. See Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002). Any such evidentiary error was not reversible error. See id.

22

**CONCLUSION**

For the reasons set forth above, we AFFIRM the bankruptcy court's summary judgment dismissing Havens' involuntary petition against the Leong Partnership.[17]

---

[17] On February 7, 2018, Havens filed a motion to supplement his briefs, and to suspend this appeal pending the outcome of other litigation, as well as a request for judicial notice. All relief Havens sought by way of his motion is ORDERED DENIED. None of the issues Havens discusses in his motion are relevant to our analysis and resolution of this appeal, or to the dispositive issue in this appeal: the fact that Havens' claims against the Leong Partnership are subject to bona fide dispute.

23